THE PEOPLE v. EDWARD B. SHAW AND LEWIS JONES.

*Larceny—Confidence games.*

57 403
116 450
116 451
57 403
123 73

1. Larceny covers the taking of money by confederates on a sham bet contrived by them to defraud a person who advances the money for the bet, and takes part in the transaction.

2. Fraud in obtaining possession of money may supply the place of a trespass in taking it, so as to make the conversion of it felonious.

3. False pretenses, embezzlement and receiving or concealing stolen property, are recognized as kindred offenses with larceny, by How.

Stat., § 9546, which permits them to be counted upon in an information for larceny. But this does not authorize a conviction except for an offense charged.

Error to Eaton. (Hooker, J.)    June 11.—June 17.

LARCENY. Respondents bring error. Affirmed.

Attorney General *Moses Taggart* for the People.

*Frank A. Dean* for respondents appellant. Where one parts with his property, voluntarily consenting thereto, it cannot be larceny, however fraudulent the means by which it was obtained: *Ross v. People* 5 Hill 294; 2 East P. C. 668; 1 Whart. Cr. L. § 888; 2 Arch. Cr. Pl. 371–2; if the money was loaned, no matter how false the means by which it was effected, it is not larceny; *Hildebrand v. People* 56 N. Y. 396; in such a case there can be no trespass, and there can be no larceny without trespass: *People v. McDonald* 43 N. Y. 61; *People v. Hall* 1 Den. 123; 2 Bish. Cr. L. § 817; the distinction quite universally recognized by the courts is this: If the owner part with the possession merely, it is larceny: but if he part with the property, although induced so to do by fraudulent means, the offense is false pretenses: *Zink v. People* 77 N. Y. 126; 1 Whart. Cr. L. 974.

CAMPBELL, J. Respondents were convicted of larceny from James Brown of $80 in money, which was accomplished by means of legerdemain with marked cards. The only substantial question before us, worth noticing, is whether the fraudulent transaction, whereby the victim was deprived of his money, came within the definition of that offense. Although he was taken in while trying to aid in performing a sharp trick himself, yet this may not destroy the public wrong if one existed.

Shaw and Jones were confederates in the fraud. Shaw had introduced himself to Brown as a traveler for a tea-dealing firm in Cincinnati, and told him that one of the means for getting custom in a new place was offering purchasers a chance, by drawing cards, to get fifty pounds free, in addition to the purchase, if they drew the winning card. In order to carry out the scheme, he wanted Brown to accompany him, and showed him how to draw the lucky card, by

a little dot on the back. While they were practicing, and Brown succeeded each time in drawing the card, Jones came up, appearing to be a stranger, and inquired what they were doing, and Shaw told him he would show him, and gave him the same explanation as to the mode of selling tea, but did not tell him about the marked cards. Shaw, after some talk, said that Brown could draw the 50-pound card. Jones offered to bet $100 that he could not, and held out to Shaw what seemed to be a roll of bills. Shaw said he had not the money, but had a $300 check. Jones said he did not want the check; he wanted money. Shaw asked Brown if he had it. Brown said he had not a $100, but had $80. Brown at Shaw's request handed him the $80, and Shaw whispered to him to draw the marked card. He drew it, and it was a blank, and Shaw at once handed the money to Jones. There were some subsequent performances which indicated the conspiracy between the respondents, but the larceny was charged on these facts, and their purpose. The court below refused to charge the jury that they did not make out larceny. No other part of the general charge is material, as it all rested on an explanation of principles involved in holding that it might be larceny if done with intent to steal. Brown testified that he expected the money to be handed back, and that Shaw would infallibly win. The court, in substance, told the jury that if money is handed over to cover a wager, understanding and expecting that it will not be delivered until won, or honestly won, there is a condition that it shall not be otherwise delivered, and if the wager is fraudulent, and the whole is a swindle, the law holds the condition is not complied with. There was a further charge making the guilt of the parties hinge on their intention, and some cautions were given to the jury against allowing the misconduct of either party to lead them to a disregard of the law. The case does not very clearly show how far the exceptions went, as actually taken, but we shall assume they covered the important question as to the legal quality of the fraud.

There is some rather attenuated discrimination to be found in the books between such cheats as induce a person

to give temporary custody of his property to another, who keeps or disposes of it, and those whereby he is induced to part with it out and out. We do not think it profitable to draw overnice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's money by such tricks as those which were played here, it is not going beyond the settled rules of law to hold that the fraud will supply the place of trespass in the taking, and so make the conversion felonious. We have a statute which provides that an indictment for larceny may include counts for false pretenses, embezzlement, and receiving or concealing stolen property, and allowing the jury to convict of either. How. Stat. § 9546. While this will not allow a conviction except for an offense charged, it nevertheless recognizes the kindred nature of these offenses, and indicates a purpose to facilitate dealing with such offenders. In *Robson's Case*, Russ. & R. 413, the circumstances were nearly like those in the present case, and where they differed, it was not in a way to negative criminality here. In that case, the person whose money was alleged to have been stolen, was induced to take part in a bet, and put his money in the hands of a stakeholder, who paid it over to the winner. The bet, as here, was got up by confederates, who played into each other's hands, and one of whom persuaded the victim that the bet was certain. They were convicted of larceny, and the trial judge, who allowed the conviction, referred the point for the opinion of the judges, ten of whom met and agreed in sustaining the conviction, because, at the time of taking, the owner only parted with the possession of the money. As the opinions are not reported, it can only be inferred that the judges thought there was no bona fide wager which made the stakeholder anything more than the temporary bailee, and therefore the transfer and acceptance by the apparent winner were unauthorized, and operated as a felonious taking. The case is substantially like this, except that Brown made no bet, but handed his money to Shaw on the belief that there was a real bet between him and Jones. Brown himself deserves no special favor for undertaking to

facilitate Shaw's knavery. But this does not help respond-ents, whose methods consisted in tempting weak fools into confiding in their superior cunning. Their offense is the same as if Brown had been altogether virtuous. They used just so much trickery as was necessary to get his money on a sham bet, and that was enough, as we think, to bring them within the law.

The judgment must be affirmed.

The other Justices concurred.