Crum *et al. v.* The State.

## CRUM ET AL. *v.* THE STATE.

[No. 18,285.   Filed October 5, 1897.]

CRIMINAL LAW.—*Larceny.—Obtaining Money by Trick or Deception.—* One who obtains from another the possession of money, representing that he has an agency through which he can obtain five dollars for one which would pass anywhere, and agrees to make such person his partner in the scheme and either return the money so obtained or give to him such counterfeit money of five times the amount obtained, and immediately appropriates the money to his own use, without any intention either to return it or give the counterfeit money, is guilty of larceny, and not of obtaining money by false pretenses.  *pp. 406–408.*

INSTRUCTIONS.—*When Instruction is Incomplete.— Practice.—* Error cannot be predicated on the giving of an incomplete instruction where an additional or more definite instruction was not requested by the complaining party.  *p. 408.*

CRIMINAL LAW.— *Disfranchisement.— Larceny.— Infamous Crime—Statute Construed.*—The crime of larceny is an infamous crime within the meaning of section 8, article 2, of the state constitution, and disfranchisement for any determinate period may be imposed as part of the punishment for one convicted of such crime under the provision of section 2006, Burns' R. S. 1894 (1933, R. S. 1881).  *pp. 408–411.*

EVIDENCE.—*Proof of Commission of Other Like Offenses.—Criminal Law.— Larceny.—*Evidence of other similar offenses committed about the same time as the crime for which defendant is on trial is admissible in a prosecution for larceny by obtaining possession of money under promise to return it in a few days or give five times the amount in counterfeit money which could not be detected, without any intention either to return the money obtained or give the counterfeit money.  *Story* v. *State,* 86 Ind. 208, in so far as in conflict with this holding is overruled.  *pp. 411–413.*

VOL. 148—26

From the Grant Circuit Court. *Affirmed.*

*Austin De Wolf* and *H. J. Paulus*, for appellants.

*W. A. Ketcham*, Attorney-General, and *Elias Bundy*, for State.

HOWARD, J.—The appellants, John W. Crum and John C. Evans, were convicted of grand larceny, and ask for a reversal of the judgment against them, claiming, first, that the evidence was insufficient. The evidence was chiefly that of the prosecuting witness, which was corroborated by that of other witnesses.

It appears that Evans was president of a bank in Jonesboro, and Crum was an insurance agent in Marion. The prosecuting witness was a farmer named Haines living near Marion, and was related by marriage to Evans. On August 22, 1896, Evans and his wife called to pay a visit to Haines, who lived with his mother. Evans and his wife stayed all night. During the evening Mrs. Evans spoke quite freely of how well her husband had got along, that he was making money rapidly; and said that farming was a pretty slow business, and if one wished to make money fast he must do something else. The evidence of Haines, the prosecuting witness, then continues: "After the women folks had retired for the night, Evans hitched over his chair nearer mine and began to talk on the money question, said that he had a scheme on foot by which if he had the money he could go to New York City and get a large amount of good money, * * * said that he could get five for one and that it was good money that would pass anywhere. * * * Told about a friend he had there that made this offer to him." That his friend in New York "was connected with the Continental Insurance Company." That the insurance company "had a man here at Marion that

would give the numbers that would pass him through that bank." The money "would come through the Continental Insurance Company's bank, in the back room, New York City." Evans wanted $1,000.00 of the witness. This was on Saturday, and it was agreed that on the succeeding Saturday the witness was to meet Evans in Marion to continue the negotiations. Accordingly, Haines went to Marion as agreed. Did not at first meet with Evans, and went to Crum's office on some insurance business. He did not say anything to Crum about the proposed deal with Evans, as he did not then know that Crum was the man that Evans had referred to as the one through whose aid the money could be procured in New York; although he did know that Crum was the local agent for the Continental Insurance Company. Incidentally, however, he asked Crum if he knew where the witness "could get two for one;" to which Crum replied, "Yes, five for one." He also asked Crum if he had seen Evans; to which Crum answered, "No," to wait, that Evans would be in directly. Towards evening, and some time after leaving Crum, witness met Evans, and they started together for a retired place, out of town, called McClure's woods. On the way Crum fell in with them. After reaching the woods they began again on the money question. Evans showed witness good money, and gave him a five-dollar bill to take and try it. He spoke again of "the wonderful money in the east that he could get;" "that the Continental Insurance Bank had the money there to let at five for one." He said it would pass anywhere. Crum read a letter purporting to be from the Continental Insurance Company. The letter said that the money was there, that Crum had made a large amount of money for the company, and that "they wanted him to be wise." " 'Come, friend Crum, and be wise,' is what it said." The witness

agreed to try to raise the money requested of him, and they separated, returning by different roads to the town. A few days after, Crum and Evans came to him at the farm to see if he had the money, and he told them he yet lacked something over two hundred dollars. They urged him to hurry the matter, that "we had to make the deal right away if we made it at all." The next day witness went to Marion and met Evans, telling him he had the money, $1,000.00, in checks and certificates of deposit. Evans, however, told him to go to the bank and get the cash, which he did, and they repaired at once to McClure's woods, where they found Crum, and the money was counted out and given to Evans. They first suggested that witness go to New York and get the counterfeit money, and on his refusing, Evans said he would take the first train and go himself. Crum said there would be no trouble in getting the money, "that he would give the numbers that would pass Evans through." Crum wrote a check on Evans' bank for $10,000.00 as his share in the enterprise. Evans looked at the check and pronounced it good, saying that Crum had deposited that much money a few days before. Evans then said he would need more money, and he wrote a note for $4,000.00, which witness signed. Evans said he would indorse it and draw the money on it, and would see that the note was paid out of the money they should receive from New York. When Crum offered his $10,000.00 check, Evans at first objected, saying there were but two in the deal, himself and witness, but Crum insisted that he must be a partner, and Evans yielded. Evans and witness together were to get $50,000.00, or $25,000.00 apiece. The bogus money was to be shipped by Evans to witness by express, and it was agreed that he should not open the package until they were all together. On the day appointed, witness went

Crum *et al. v.* The State.

to the express office, and was told by the agent that there was a money package for him. He took the package home and put it in his trunk until the next day, when he took it out and carried it in a sack to an old house and there carefully buried it in a pile of oats which he had upstairs. That evening Evans and Crum came along and inquired if he had received the package, and then told him to bring it to a piece of woods about half a mile away. Crum cut the cords and unwrapped the package, and then asked Evans if the box looked as it did when he nailed it up. Evans said the nails were larger in one of the lids than when he nailed it up. The lid was then pried off, and nothing but bunches of paper were found in the box. Evans then said it was not the way that he had left it, that he had counted the money, placed it in the box and then nailed it up. He said if they told about this they "would all go to the penitentiary." He then flew into a passion, exclaimed that he had been robbed, that Crum and witness had robbed him and that he would kill them both. With that he drew a revolver and pointed it at witness; but Crum interferred and kept him from shooting. Crum grabbed Evans and they had a terrible scuffle, during which witness, in great fright, "took to his heels and ran through the woods." After that Crum called to witness to come back, that he had secured Evans' revolver, holding it up so that witness could see it. Witness went back and found that Evans had gone. Crum said he had struck him and Evans had then run off. He said he would find out whether Evans ever sent the money; that he had been robbed of $10,000.00, and that witness had not done it. He said, also, that witness had best not say anything about the matter, as they were all liable to be sent to state's prison for twenty-two or twenty-three years. Crum then picked up the box and all the

paper and wrappings and took them to his buggy and drove off, while witness went home.

Other evidence goes to show Crum's full participation in the scheme, and that both appellants conspired to deprive Haines of his money, without any purpose on their part of even giving him the counterfeit money they pretended to be able to get. It was all a detailed contrivance to play on the cupidity and simplicity of Haines and thus obtain his money and at once appropriate it to their own use.

Counsel endeavor to argue that the crime committed was that of obtaining money under false pretenses, and not larceny. The facts, however, show that Haines parted with the possession only, and not with the title to his money; it was to be returned to him in thirty days at the farthest, or five to one should be given him for it in the New York money. They did neither. Larceny may be committed not only by taking property from another without his knowledge, but also by a trick, by means of which the owner's property is taken by some false token or other deception. If there is a present purpose to obtain possession of the property of another by such deception, and to at once appropriate the property to the use of the wrong-doer, there is larceny. Indeed, in such a case, there is in reality a taking without the knowledge of the owner, for, by means of the trick or deception prac\*ticed, his knowledge is clouded, so that he loses possession of his property without realizing that it has been taken. But, in such a case, the title remains with him, so that the crime is larceny, and not obtaining property under false pretenses. In the latter case, both the possession and the title go to the wrongdoer; the owner freely parts with both, either for some worthless consideration, or because in some way he is persuaded to do so by false representations. Had ap-

pellants, in this case, carried out their agreement and procured the counterfeit money by investing Haines' money in New York, it might be that he would thus have parted with the title, and the offense would have been that of obtaining money under false pretenses. But as it was, appellants had no intention to do as they agreed, but at once appropriated the money to their own use. This was larceny.

It has frequently been held that larceny may be committed by wrongfully obtaining possession of property by trick, as well as by securing it by stealth. See *Fleming* v. *State*, 136 Ind. 149; *March* v. *State*, 117 Ind. 547; *Grunson* v. *State*, 89 Ind. 533, 46 Am. Rep. 178, and authorities cited in those cases. In Gillett, Crim. Law (2d ed.), section 540, the rule in such cases is well stated as follows: "Where the defendant, with a preconcerted design to steal the property, obtains possession of it by fraud, the taking is larceny, for the reason that, as the fraud vitiated the transaction and left the title in the original owner, he still retained a constructive possession of the goods, and the conversion of them by the defendant is such a trespass to that possession as makes larceny." Other authorities showing that larceny may be committed by trick or deception are: *Huber* v. *State*, 57 Ind. 341, 26 Am. Rep. 57; *Loomis* v. *People*, 67 N. Y. 322, 23 Am. Rep. 123; *People* v. *Rae*, 66 Cal. 423, 6 Pac. 1, 56 Am. Rep. 102; *People* v. *Shaw*, 57 Mich. 403, 24 N. W. 121, 58 Am. Rep. 372; *United States* v. *Murphy*, 48 Am. Rep. 754; *Soltau* v. *Gerdau*, 119 N. Y. 380, 23 N. E. 864, 16 Am. St. 843. It is true, that where there is a contract for the loan of money, or where money is otherwise voluntarily paid to another, on account of some misrepresentation, the crime may be that of obtaining money under false pretenses, and not larceny. Such cases were: *Perkins* v. *State*, 65 Ind. 317, and *Kellogg* v. *State*,

26 Ohio St. 15, cited by appellants. Those cases are not here in point. Here, the money was obtained under an agreement to purchase certain pretended other money, without any design on the part of the conspirators to make any such purchase, but with the intention of appropriating the money to their own use.

A part of instruction No. 6, given by the court, is objected to. It was as follows: "Larceny, however, may exist although the possession of the alleged stolen goods is obtained with the consent of the owner, if that consent is procured by deception and with the intent not to return the same, but to appropriate the same and deprive the owner thereof and of the remedy for their loss." Counsel do not deny that this instruction is correct, so far as it goes, but they say that there should have been added to the conditions stated the further condition of "a felonious intent to steal and appropriate the property to taker's use." It may be questioned whether the felonious intent to appropriate the property to the taker's use is not sufficiently expressed in the instruction as given; but however that may be, the instruction as given is correct, and if counsel desired additional or more definite instruction on this point they should have asked for it.

In instruction No. 12, given by the court, the jury, in conformity with the provisions of the statute, section 2006, Burns' R. S. 1894 (1933, R. S. 1881), were told that if they found the defendants guilty as charged, it would be their duty to inflict as a part of the punishment "disfranchisement for any determinate period." Appellants contend that this was error, for the reason that larceny is not an infamous crime, and as the constitution, article 2, section 8, provides that, "The General Assembly shall have power to deprive of the right of suffrage, and to render ineligible any person convicted of an infamous crime," therefore,

the statute above cited, in so far as·it authorizes disfranchisement in case of conviction for larceny, is unconstitutional. The constitution does not declare what crimes are infamous; neither has the statute made any provision on the subject, unless it might be said that the legislature, in enacting the statute above cited and other statutes which prescribe disfranchisement as a part of the punishment of a given crime, has thereby, in effect, declared such crime to be infamous. However that may be, we are of opinion that larceny, being a felony, is an infamous crime, and was so understood to be in the adoption of the constitutional provision referred to.

In 1 Wharton Crim. Law (10th ed.), section 22a, it is said: "At common law, 'infamy' was held to attach to all crimes, a conviction of which impressed such a moral taint on the perpetrator as was supposed to require his incapacitation as a witness and the suppression of his political rights. Infamy, in this sense, includes treason, felony, and the *crimen falsi;* and a conspiracy to commit an infamous offense partakes of the character of the offense at which it is aimed."

In Black's Law Dictionary at page 618 it is said that "A crime punishable in the state prison or penitentiary, with or without hard labor, is an infamous crime, within the provision of the fifth amendment of the constitution [of the United States] that 'no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury.' " Citing *Mackin* v. *United States,* 117 U. S. 348, 6 Sup. Ct. 777. And see *Ex parte Wilson,* 114 U. S. 417, 5 Sup. Ct. 935. The same rule holds in New York, as said in the same connection, by Mr. Black, citing 2 Rev. St. (p. 702, section 31), p. 587, section 32.

In 4 Am. and Eng. Ency. of Law, 644, it is said, that

"A crime punishable by imprisonment in the state prison is an infamous crime." And on page 646 of the same authority, larceny is named as one of the offenses which have been held to be infamous. In 10 Am. and Eng. Ency. of Law, 605, it is added, in note, that even petit larceny is infamous at common law.

In 1 Bishop Crim. Law (7th ed.), section 974, the author says that larceny is an infamous crime, "because it is a felony." So, also, he says, "is the knowingly receiving of stolen goods; and so, at the common law, is even petit larceny."

It is true that in *Glenn* v. *Clore*, 42 Ind. 60, citing *Pruitt* v. *Miller*, 3 Ind. 16, it was said that "Not all felonies render the perpetrator of them infamous." But the statement in *Pruitt* v. *Miller, supra,* was based upon a statute under the old constitution, R. S. 1843, p. 999, section 79, and p. 719, section 261. Those decisions, moreover, had relation to the competency of witnesses, as affected by such crimes. The legislature, however, has power at all times to regulate the competency of witnesses; and has, in fact, made almost all persons competent, except the insane, children lacking capacity, and certain persons having confidential relations with either of the parties, sections 504, 505, 514, 1867, Burns' R. S. 1894 (496, 497, 506, 1798, R. S. 1881). The decisions cited are, therefore, for several reasons, no longer, if ever, controlling in the matter here under consideration.

It is clear, then, as we think, particularly from the fact that at common law all felonies, including larceny, were infamous crimes, that the legislature had ample authority under the constitutional provision cited, to provide "disfranchisement for any determinate period" as a part of the punishment to be imposed for the crime of larceny; and, consequently, that the court did not err in so instructing the jury.

Further complaint is made that the court erred in refusing numerous instructions asked by appellants, and also in giving certain instructions asked by the State. We are of the opinion, however, that the questions thus raised have been fully considered in passing upon the sufficiency of the evidence to sustain the verdict. The evidence, as we have seen, plainly shows the commission of larceny in obtaining possession of the prosecuting witness' money by elaborate and detailed deception and trickery. There was no loan of money; neither was the crime committed other than that charged in the indictment.

Appellants complain, finally, that the court erred in the admission of evidence of other like crimes committed by them about the time of committing the crime here charged. This evidence was quite proper in order to show the intention with which the acts charged as criminal were committed. The appellants were not tried or punished for the other offenses committed; but by the evidence given of such like transactions by them about the same time the jury were the better able to apply the evidence given as to the offense charged. Appellants' own counsel have themselves tried hard to show that the acts charged in the indictment were not criminal, or, even if criminal, that the crime was other than that for which they were indicted. In such equivocal cases it is proper to show the nature of the offense charged, and also the intention with which it was committed by referring to other like acts committed by the same persons. The evidence objected to showed that appellants were expert and unscrupulous confidence men, engaged in the business of fleecing the unwary, by stealing their money under pretense of giving them "other money, five to one, just as good."

As said in 1 Bishop Crim. Law (7th ed.), section

1065: "Cases are numerous in which proof of one crime is received to establish another." So in Gillett's Indirect and Col. Ev., section 68, it is said: "The weight of authority favors the view, however, that where the direct evidence shows that an act was done or omitted, it is competent to prove that a custom existed prior to that time to do or not to do such act, as such evidence legitimately tends to uphold the theory of one of the contending parties."

In 3 Rice Ev., section 155, citing American and English authorities, it is said: "Although evidence offered in support of an indictment for felony be proof of another felony, that circumstance does not render it inadmissible. If the evidence offered tends to prove a material fact, it is admissible, although it may also tend to prove the commission of another distinct and separate offense." And it is there added that, "The principle is, that all the evidence admitted must be pertinent to the point in issue; but if it be pertinent to this point, and tends to prove the crime alleged, it is not to be rejected, though it also tends to prove the commission of other crimes, or to establish collateral facts."

It is true that such evidence of similar offenses is more frequently received in cases of forgery and counterfeiting than in any others. This, however, is only because in such cases the commission of other like acts tends more frequently to show the intent with which the act charged was done. In principle there can be no reason why in any case the intent with which an act was done may not be proved by competent and pertinent evidence, even though proof may thus incidentally be made of other offenses. See, also, the able dissenting opinion of Elliott, J., in *Strong* v. *State*, 86 Ind. 208, which we think correctly expresses the law on this question. The decision of the court in

that case, in so far as concerns the question here considered, is therefore overruled.

There can be no doubt that this case was fairly tried. No more detestable crime could be committed against the good order of society. The acts done by appellants made up a combination of cheating, lying, stealing, and breach of confidence, tending to make all honest, simple-minded people suspect every polite stranger they meet with, and even to distrust their own friends and neighbors. Such a crime against society should be most severely punished. That the president of a bank and an insurance agent should combine to impose upon a simple-minded, hard-working man, unfamiliar with the intricacies of business, but adds to the iniquity of the offense. The truth is that the three years or five years imprisonment to which appellants were respectively sentenced, was not an adequate punishment for their offense; and if a new trial should be awarded for any reason, and such reason could be a legal cause for a new trial, it would be only that the punishment might be increased. The fact that the credulous, simple-minded prosecuting witness was himself willing to aid in circulating counterfeit money, does not lessen the guilt of his tempters, any more than did the weakness of the denizens of Eden excuse the villainy of the arch fiend who corrupted them.

Judgment affirmed.