THE STATE OF UTAH, Respondent, v. JAMES DONALDSON, Appellant.

No. 1952. Decided January 6, 1909 (99 Pac. 447).

1. LARCENY—EVIDENCE—SUFFICIENCY. Evidence on a trial for larceny *held* to authorize a finding that defendant obtained the money, which he claimed to have won by betting at cards, either by fraud, trick, or artifice with the intent at the time to appropriate it to his own use, and deprive the owners thereof. (Page 101.)

2. LARCENY—TAKING. Though defendant did not intend to keep all of the money which he claimed to have won by betting at cards, and intended to divide it with those connected with him in the alleged game, it would still be larceny of the whole amount. (Page 101.)

3. LARCENY—EVIDENCE—SUFFICIENCY—CONSENT OF OWNER. Evidence on a trial for larceny *held* to authorize a finding that there was no consent by the owners that the right to the money should pass to defendant. (Page 101.)

4. LARCENY—TAKING—TRICK OR DEVICE. The obtaining of money under pretext of betting at cards and the best hand winning, but where in fact prosecuting witness had no chance to win, and was the only player who actually risked anything, is larceny within Comp. Laws 1907, section 4355, defining larceny to be the felonious taking of the property of another, and such a game cannot be held to constitute gambling merely, and the offenders punishable for that offense alone. (Page 101.)

5. LARCENY—EVIDENCE—CONSPIRACY. Evidence on a trial for larceny *held* to authorize a finding that there was a conspiracy among the persons concerned in the taking. (Page 102.)

6. COURTS—OPINIONS—MERITORIOUS ASSIGNMENTS. Though the Supreme Court always endeavors to pass upon all the errors assigned and argued and to comply with the constitutional requirement of giving the reasons for its conclusions, it nevertheless must limit the discussion to assignments that contain merit. (Page 103.)

7. CRIMINAL LAW—APPEAL—HARMLESS ERROR—ADMISSION OF EVIDENCE. Where a witness testified as to the character of defendant and the state was permitted to ask on cross-examination, over defendant's objection, whether it was not true that the only association witness had had with defendant for the three months preceding the acts in question was that they smoked opium together in a disreputable resort, to which the witness answered, "No." *Held* any error in the allowance of the question was harmless. (Page 104.)

APPEAL from District Court, Third District. *Hon. Geo. G. Armstrong,* Judge.

Defendant convicted of grand larceny appeals.

AFFIRMED.

*S. A. King* for appellant.

*M. A. Breeden,* Attorney General, and *A. R. Barnes,* Assistant Attorney General, for the respondent.

FRICK, J.

The defendant was charged, tried, convicted, and sentenced for the crime of grand larceny, and now presents the record on appeal.

The evidence, stated in condensed form, tended to establish the following facts:

That the alleged crime arose out of an alleged conspiracy entered into by several individuals, hereafter referred to, by means of which two young Scotchmen, while on their way from Scotland to Los Angeles, on the day of the alleged crime, while stopping off at Salt Lake City, were deprived

of $10,373. In passing along the streets of the city, they met a stranger of whom they made some inquiry with regard to the location of some point in the city, when he informed them that he was likewise a stranger in the city, but at once seemed to take an interest in them. He introduced himself as "Mr. Morris," and, after giving them somewhat of his history, invited them to go with him to a certain room where he said he expected to meet a friend of his uncle. The two brothers went with him, and, when they arrived at the room, Morris knocked at the door, and after some delay both he and the two young men were admitted into the room in which the defendant and another (as they said) had been engaged in a game of cards. Morris introduced the two brothers by their names to the other two who were in the room, but gave these two ficitious names. The defendant was titled "Doctor," and the other, who was in fact a brother of Morris, was introduced as a mining expert. The mining expert entered into a conversation with the two brothers about mines and precious ores for a short time, after which he and the defendant asked permission to continue their game of cards, which was given. Morris soon joined the game. After he had played some time, he asked the elder of the two brothers to take his (Morris') place in the game. The Scotchman declined to play, protesting that he knew nothing about the game. Morris, however, urged him to play, stating that he (Morris) would show him how, and for that purpose offered the Scotchman the "chips" which Morris claimed he had won, amounting, as he said, to the value of $40. The elder brother thus entered the game. He was asked to deal the cards, and did as directed by dealing one card at a time to each player, and, as soon as the first card had been dealt, the betting was started by the defendant. Neither the defendant nor the mining expert displayed any money, and, when the bets had exceeded the amount of the chips which Morris had given to the elder brother, he was urged by Morris to meet the bets of the defendant and the mining expert by putting up money. When the Scotchman

demurred to this, he was told by Morris that this was nec-
essary in order to avoid losing. the amount that had been
staked, and that, if it were not done, Morris' winnings would
be taken up by the other two players. When the Scotchman
further demurred because he alone was required to put up
money, Morris pretended that he would put up his own mon-
ey. To this the other objected, insisting that, inasmuch as
the Scotchman played the hand, he should put up his own
money.

He was finally persuaded to do so upon the assurance by
Morris that it was necessary in order to protect what was
already at stake, and that the Scotchman in all events would
win in the end if he continued to meet the bets as made by
the other two, since he held the winning hand. In this way
the bets were raised from time to time until the Scotchman
had $2,050 on the table. After that amount of money was
on the table, and five cards had been dealt to each player,
the defendant claimed that he had won, and took the money
from the table and put it in his pocket. The Scotchman
protested, and claimed that he was being robbed of his mon-
ey, and asked his brother, who was in the room all of the
time, to call a policeman. Morris at once said that he him-
self would go for a policeman, and left the room. Within
a few minutes thereafter he came back with two others, who
represented themselves to be policemen. As soon as the
alleged policemen arrived in the room, the Scotchman told
them his troubles, and claimed that he was being robbed.
After some parley, the alleged policemen pretended that
it was necessary for them to search the players, and all who
were engaged in the game, including the Scotchman, were
searched. The $2,050 was given up by the defendant to one
of the alleged policemen, who also demanded from the elder
brother the balance of his money, which, after some protest,
was given to the alleged policeman, amounting to $8,373,
and which had been displayed by the Scotchman in making
the bets as aforesaid. The alleged policemen gave the
Scotchman a receipt therefor, stating at the time that the

money so taken, including the $2,050, would all be accounted for when they should arrive at the police station, where all were to be taken forthwith. This receipt was produced at the trial and introduced in evidence. The two alleged policemen, however, did not take any of the parties to the police station, but the two brothers were placed in charge of a socalled deputy policeman, who trailed them around the city, first under one and then under some other pretext, while the others went with the alleged policeman who had the money, and the defendant and the mining expert were not seen thereafter by the two Scotchmen. After this plans were at once adopted to get the two brothers out of the city, which after considerable parley was accomplished, after returning to them $1,000 out of the $10,373, all of which had been taken from the Scotchman, as aforesaid. The two brothers then took the train and went on their way to Los Angeles, from whence they thereafter returned to Salt Lake City. The $9,373 was afterwards divided among the two alleged policemen, the defendant, and the mining expert. The division, however, was not made in equal proportions, but this fact is not deemed material.

It further appeared from the evidence that, if the three players had risked equally in the game, the whole amount of money staked would have amounted to $6,150, all of which the defendant claimed to have won. He, however, never asked for nor received any amount from the mining expert, who, like the Scotchman, would have been loser in the game to the amount of $2,050. It further appeared that the defendant, the mining expert, Morris, and the two alleged policemen were all gamblers, following that vocation for a livelihood. The defendant, however, claimed that he only knew Morris and the mining expert, and that he did not know the two alleged policemen, and did not know that they were coming to the room, or know anything with regard to what was contemplated by them. The two brothers also testified that out of the whole amount of money taken as aforesaid upwards of $1,200 belonged to the

younger brother, but that the older one was the custodian of all of it, and that it was all kept together as one entire sum.

We have omitted very many details from the evidence from which inferences might be deduced, some of which could be said as being favorable to, while others might be taken as making strongly against, the defendant. Other inferences tended strongly to establish the alleged conspiracy.

It is asserted by appellant that the evidence is insufficient to sustain a conviction for the crime of grand larceny, and that it is likewise insufficient to establish the conspiracy which the state claimed existed between the defendant and the other four individuals to whom we have referred. The entire evidence is preserved in the bill of exceptions, and covers over 870 pages of typewritten legal cap. We cannot set it forth even in condensed form, and shall not attempt to do so any further than we have already done. From a careful perusal of the record, we are convinced that there was ample evidence to sustain every element of the crime charged. The jury were authorized to infer from the facts and circumstances proved that the defendant obtained the $2,050, which he claimed to have won, either by fraud, trick, device, or artifice, with the intention **1, 2** at the time he obtained the money to appropriate it to his own use, and to deprive the owners permanently of the money. But if it were true that he did not intend to keep all of it, and to divide with those who were connected with him in the alleged game, it would still be larceny of the whole amount. The jury were further justified in finding that the right to the money never passed to the defendant, for the reason that the consent of the owners that it should pass was lacking, but rather that the defendant obtained and took it against their con- **3, 4** sent. Under such circumstances it is elementary that money, or any other thing of value thus obtained, constitutes larceny at common law. While the authorities are very

numerous, we shall cite but a few in which the principle involved is illustrated, namely: *People v. Shaw*, 57 Mich. 403, 24 N. W. 121, 58 Am. Rep. 372; *People v. Shaughnessy*, 110 Cal. 598, 43 Pac. 2; *People v. Berlin*, 9 Utah, 383, 35 Pac. 498; *People v. Miller*, 169 N. Y. 339, 62 N. E. 418, 88 Am. St. Rep. 546. In the latter case the authorities are in part collated. Our statute (section 4355, Comp. Laws 1907) is in effect, no more than a definition of larceny at common law. In view of the authorities, the jury were also justified in finding that there was a conspiracy entered into among the five individuals who were concerned in the taking of the money belonging to the brothers. (4 Elliott on Evidence, sections 2937, 2938, and 3 Ency. of Evidence, 427-432.) While we cannot devote the space to refer specifically to the multiplicity of facts bearing upon the alleged conspiracy, we have no hesitancy in stating that, in view of the whole evidence, no other conclusion than that of the guilt of the defendant could well have been arrived at by any impartial jury; nor could they for the same reasons have arrived at any other conclusion than that a conspiracy existed. To say that the taking of the money, under the circumstances of this case, does not constitute larceny, would be to say that the commandment "thou shalt not steal" is a delusion, and our statute upon the subject a farce. As was said by Mr. Justice Campbell in a similar case, namely, *People v. Shaw*, 57 Mich. 406, 24 N. W. 122, 58 Am. Rep. 372:

"We do not think it profitable to draw overnice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's money by such tricks as those which were played here, it is not going beyond the settled rules of law to hold that the fraud will supply the place of trespass in the taking, and so make the conversion felonious."

So in this case we would, indeed, lose sight of substance, and follow a mere shadow, if we held that the money was won by the defendant at a game of cards in which all the players risked their money and the best hand won. It is

clear to us that the Scotchman never had a chance to win, that it was not intended that he should win, and that he was the only one of all the players that actually risked anything or could lose a farthing. To hold, therefore, that such a game constitutes merely gambling, and that the offenders are punishable only for that offense, would be to hold that the intent with which an act is done is not to be looked to to determine its criminality, but that the name by which it is known alone controls. We are not prepared to hold any such doctrine. The objection that the acts proved did not constitute the crime of grand larceny, and that no conspiracy was proved to have existed between the gamblers, cannot be sustained.

In addition to the foregoing, there are 169 other errors assigned. While we always endeavor to pass upon all the errors that are assigned and argued and to comply with the constitutional requirement of giving the reasons for our conclusions, we nevertheless must limit the discussion to assignments that contain merit. After a careful perusal of the record, we are fully convinced that, while a very few of the assignments may constitute what are termed as technical errors, not a single one of all those that are assigned in view of the whole record constitutes prejudicial error. The defendant was in no way prejudiced in any substantial right by any of the court's rulings upon the trial, nor by any instruction given or refused, nor by the conduct of the Attorney General, of which complaint is made. As an illustration of one of the numerous rulings of the court in admitting evidence, the admission of which it is now strenuously insisted constituted error, both with regard to the evidence admitted and as to the misconduct of the prosecuting attorney in propounding a question, the following will serve as a sample: At the trial the defendant put in issue his general reputation for honesty, integrity, and fairness as a gambler. To prove such reputation, he called another gambler who testified of his acquaintance and long association with the defendant, and that the de-

fendant's reputation as an honest and fair gambler among his associates and the gambling fraternity generally was good. On cross-examination the witness was questioned at some length with regard to his association with the defendant, and was, among other things, in substance, asked the following question, which was permitted to be answered over defendant's objections, namely: Whether it was not true that the only association the witness had with the defendant for the three months preceding the acts in question was that they smoked opium together in Plum alley, a disreputable resort in Salt Lake City. To this the witness answered "No." The question was again asked in another form, and the objection thereto was sustained. It will be observed that the only fact inquired about by the prosecuting attorney was thus sa'd not to exist; that is, instead of establishing the fact, the testimony was to the effect that such fact did not exist. Suppose the witness had been asked whether it were not true that the defendant was a thief, and the answer had been "No," would it have been prejudicial error to have admitted the answer? No one would so seriously contend, although it were conceded that the question was wholly improper; but we cannot pause to give further illustrations, and will not devote either time or space to a further discussion of the errors assigned. We will add, however, that the instructions were fair and covered every phase of the case, and the defendant's rights were guarded at all points. In the trial of the case, if any errors were committed in the admission or exclusion of evidence, the State had far more grounds for complaint than the defendant. The rulings upon material points of the evidence were all in favor of the defendant where there was any question at all with regard to the admissibility of the proffered evidence. If the objection was to the form of the question, the defendant's objection usually prevailed, as well as when it related to the substance, unless the objection was wholly without merit. The state in many instances was not permitted to ask lead-

ing questions when nothing was sought by them except to establish a negative.

The whole record satisfies us that the defendant has had a full and fair trial, that he has not been prejudiced in any substantial right, and that the judgment of conviction ought to be, accordingly is, affirmed.

STRAUP, C. J., and McCARTY, J., concur.