ATTORNEYS FOR PLAINTIFF
William R. Groth
Geoffrey S. Lohman
Indianapolis, Indiana

ATTORNEYS FOR DEFENDANTS
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Ashley Tatman Harwel
Heather Hagan McVeigh
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Dec 15 2011, 11:14 am

CLERK
of the supreme court,
court of appeals and
tax court

### No. 94S00-1101-CQ-50

DAVID R. SNYDER,

*Plaintiff*,

v.

J. BRADLEY KING AND TRENT DECKARD, IN
THEIR OFFICIAL CAPACITIES AS CO-DIRECTORS
OF THE INDIANA ELECTION DIVISION; AND
LINDA SILCOTT AND PAM BRUNETTE, EACH IN
THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE
ST. JOSEPH COUNTY VOTER REGISTRATION BOARD,

*Defendants*.

---

Certified Question from the United States District Court for the Southern District of Indiana
No. 1:10-cv-1019-WTL-MJD
The Honorable William T. Lawrence, Judge

---

**December 15, 2011**

**Sullivan, Justice.**

Article II, § 8, of the Indiana Constitution authorizes the General Assembly to disenfranchise "any person convicted of an infamous crime." David Snyder contends that because misdemeanor battery is not an "infamous crime," his constitutional rights were violated when his voter registration was canceled after he was convicted and incarcerated for that crime. We agree that the crime in this case was not an "infamous crime" but also hold that the General Assembly has separate constitutional authority to cancel the registration of any person incarcerated following conviction, for the duration of incarceration.

## Background

The General Assembly has enacted a statutory regime under which a person convicted of a crime and sentenced to an executed term of imprisonment is disenfranchised for the duration of incarceration. Ind. Code §§ 3-7-13-4, 3-7-13-5(a), 3-7-46-2 (2005). Such a person is ineligible to register to vote, I.C. § 3-7-13-4(b), and such a person who has already registered is removed from the official list of registered voters, I.C. §§ 3-7-46-1, -2. The statutes require that prompt notice be given to a prisoner whose voter registration is cancelled. I.C. §§ 3-7-46-8, -9. But once that prisoner is released, he or she is again eligible to register. I.C. § 3-7-13-5(a). Nor are individuals disenfranchised who are on probation, on parole, subject to home detention, or placed in a community corrections program. I.C. § 3-7-13-6.

In 2008, the plaintiff, David R. Snyder, was convicted of Class A misdemeanor battery, Ind. Code § 35-42-2-1(a)(1) (2008), and sentenced by the trial court to imprisonment in the St. Joseph County Jail from March until May, 2009. On March 4, 2009, the St. Joseph County Board of Voter Registration sent Snyder a letter informing him that his voter registration had been cancelled in accordance with state law.

After his release, Snyder made no attempt to re-register, which he would have been entitled to do – the termination of his voting rights only applied to the period of incarceration. He instead filed a lawsuit in the United States District Court for the Southern District of Indiana, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 (2006), against State and County election officials ("State"). Snyder's amended complaint alleged violations of the National

2

Voter Registration Act of 1993, 42 U.S.C. § 1973gg <u>et</u> <u>seq.</u>; the Help America Vote Act of 2002, 42 U.S.C. § 15301 <u>et</u> <u>seq.</u>; the Civil Rights Act of 1964, 42 U.S.C. § 1971 <u>et</u> <u>seq.</u>; and the First and Fourteenth Amendments to the United States Constitution. The complaint also alleged a violation of the Infamous Crimes Clause of the Indiana Constitution, which gives the General Assembly power to disenfranchise persons convicted of an "infamous crime."[1]

As part of his prayer for relief, Snyder asked the Southern District to certify a question to this Court asking whether Class A misdemeanor battery is an "infamous crime." Pursuant to Indiana Appellate Rule 64(A), and upon a joint motion by Snyder and the State, Judge Lawrence certified the following question:

> Does the term "infamous crime" as used in Article II, Section 8, of the Indiana Constitution include conviction of and imprisonment for a misdemeanor battery, so as to permit removal of the convicted person's voter registration from the official list of registered voters pursuant to Indiana Code §§ 3-7-13-4 and 3-7-46-1 and -2?

<u>Snyder v. King</u>, 941 N.E.2d 1043, 1043 (Ind. 2011).

We agreed to consider this question by order dated February 21, 2011, Ind. Appellate Rule 64(B), ordered simultaneous briefing, and then held oral argument on April 21, 2011.

**Discussion**

The certified question is phrased narrowly, asking us only whether misdemeanor battery is an "infamous crime." During oral argument, Snyder's counsel asserted that we are confined to that narrow question and that the broader question of whether the Indiana statutes violate the Indiana Constitution on their face or as applied to Snyder is for Judge Lawrence to decide.

Much like the overall posture of this case, <u>see</u> Part III, <u>infra</u>, the requested narrowness of the certified question is troubling. Judge Tinder, while a judge on the Southern District of Indiana, noted that there are difficulties with concluding that disenfranchisement during incarceration

---

[1] "The General Assembly shall have power to deprive of the right of suffrage, and to render ineligible, any person convicted of an infamous crime." Ind. Const. art. II, § 8.

for conviction of a non-infamous crime is unconstitutional under the Indiana Constitution. United States v. Brown, 235 F. Supp. 2d 931, 935-36 (S.D. Ind. 2002). Like Judge Tinder, we find that the state constitutional issue in this case is more complicated than suggested by the narrowly phrased question framed by the parties.

We take Judge Lawrence's certified question as asking more broadly whether the relevant statutes run afoul of the Indiana Constitution, at least as applied to Snyder. Therefore, for practical and jurisprudential reasons, and having exercised our discretion to accept the certified question in the first instance, we revise and restate the certified question as follows: (1) whether misdemeanor battery is an "infamous crime" under Article II, § 8, of the Indiana Constitution; and (2) if not, whether cancellation of Snyder's voter registration violated the Indiana Constitution.

A few matters should be clarified before proceeding to the merits of these questions. First, scarcely any right is more sacrosanct in a democratic society than the individual's fundamental right of suffrage. See, e.g., Reynolds v. Sims, 377 U.S. 533, 555 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). That said, like all fundamental rights, the fundamental right to vote never has been considered absolute. Historically, Indiana, along with most other states, has deprived certain criminals of their civil and political rights, including the right to vote. See Part I-B, infra.

Second, the question in this case, like most constitutional issues, potentially has wide-reaching implications. This case does not involve the disenfranchisement of criminals for any period after incarceration; at issue here is the disenfranchisement of convicted prisoners only for the duration of incarceration. The disenfranchisement statute recites that it was enacted pursuant to the Infamous Crimes Clause, I.C. § 3-7-13-4(a), which grants power to the General Assembly both to disenfranchise and to render ineligible for election any person convicted of an "infamous crime," Lucas v. McAfee, 217 Ind. 534, 541, 29 N.E.2d 588, 588 (1940) (Shake, J.). Although it contains a categorical limitation, the Infamous Crimes Clause does not contain a durational limitation. Consequently, if misdemeanor battery is an "infamous crime," then it is only by legislative grace that Snyder's right to vote was restored when he was released from incarceration. To

4

be sure, the power to disenfranchise permanently persons convicted of <u>any</u> crimes even though they have completed their sentences <u>might</u> be limited by other provisions of the Indiana Constitution, such as the Proportionality Clause of Article I, § 16, and it may also be limited by the Equal Protection Clause, <u>cf.</u> <u>Richardson v. Ramirez</u>, 418 U.S. 24, 43-56 (1974) (holding that Section 2 of the Fourteenth Amendment permits states to disenfranchise convicted <u>felons</u> who have completed their sentences). It is, however, unnecessary to consider here these putative limitations because Snyder was disenfranchised by law only during his incarceration.

## I

Turning to the merits of the revised certified questions, we consider first whether misdemeanor battery is an "infamous crime" for purposes of the Infamous Crimes Clause. Indiana courts have been asked on a handful of occasions to determine whether a particular offense falls within the Infamous Crimes Clause, and in each of those cases the offense was held to be an infamous crime. <u>See</u> <u>Crampton v. O'Mara</u>, 193 Ind. 551, 139 N.E. 360 (1923) (restraining freedom of elections); <u>Baum v. State</u>, 157 Ind. 282, 61 N.E. 672 (1901) (vote selling); <u>Crum v. State</u>, 148 Ind. 401, 47 N.E. 833 (1897) (felony larceny); <u>Wilson v. Montgomery County Election Bd.</u>, 642 N.E.2d 258 (Ind. Ct. App. 1994) (making a pipe bomb), <u>trans.</u> <u>denied</u>; <u>Taylor v. State Election Bd.</u>, 616 N.E.2d 380 (Ind. Ct. App. 1993) (Class D felony criminal recklessness). These decisions applied the standard used to determine whether a crime is infamous for purposes of the Grand Jury Clause of the Fifth Amendment,[2] which requires presentment or indictment by a grand jury if a conviction might subject the accused to an infamous punishment, such as imprisonment in a prison or penitentiary. <u>Mackin v. United States</u>, 117 U.S. 348, 350-54 (1886); <u>Ex Parte Wilson</u>, 114 U.S. 417, 422-29 (1885); <u>see</u> <u>Crampton</u>, 193 Ind. at 552, 556-57, 139 N.E. at 361-63 (councilman convicted of conspiring to restrain freedom of federal elections and sentenced to one year and one day in a federal penitentiary); <u>Baum</u>, 157 Ind. at 283, 285-86, 61 N.E. at 673-74 (defendant convicted of vote selling punished with loss of civil and political rights); <u>Crum</u>, 148 Ind. at 409, 47 N.E. at 835 (holding "that larceny, being a felony, is an infamous crime"); <u>Wilson</u>, 642 N.E.2d at 260-61 (candidate convicted of making a pipe bomb in violation

---

[2] The Grand Jury Clause, which applies only to the federal government, <u>Hurtado v. California</u>, 110 U.S. 516, 534-38 (1884), provides that a person accused of "a capital, or otherwise infamous crime" can be charged only "on a presentment or indictment of a Grand Jury," U.S. Const. amend. V.

of federal law sentenced to two years imprisonment); Taylor, 616 N.E.2d at 383, 385 (councilman convicted of two counts of Class D felony criminal recklessness, each of which was punishable by imprisonment for a term of years).

Relying on our case law, Snyder argues that an infamous crime is a felony, and therefore misdemeanor battery is not an infamous crime. Contrary to the State's assertions, this argument clearly is supported by the case law. See Crum, 148 Ind. at 409, 47 N.E. at 835 (holding "that larceny, being a felony, is an infamous crime"); Taylor, 616 N.E.2d at 385 (holding that because "each of Taylor's class D felony convictions was a felony which was punishable by imprisonment for a term of years[, e]ach was, therefore, an infamous crime" (citations omitted)); cf. Sutherlin v. Sutherlin, 61 N.E. 206, 206 (Ind. App. 1901) (holding that manslaughter was an infamous crime under a divorce statute because it was a felony). Compare Crampton, 193 Ind. at 557, 139 N.E. at 362 ("It is obvious that a 'sentence' exceeding six months, without any indication as to where the imprisonment is to be, is not an apt designation of an infamous crime."), and Wilson, 642 N.E.2d at 261 ("Inasmuch as Wilson might have been imprisoned for more than one year, his offense qualifies as an infamous crime." (citation omitted)), with 1 Burns' Ann. Ind. Stat. § 1866 (1914) (defining "felony" as a crime punishable "with death or imprisonment in the state prison"), and Ind. Code § 35-50-2-1(b) (1993) (defining "felony conviction" as a conviction for which a "convicted person might have been imprisoned for more than one (1) year").

Although the felony-misdemeanor distinction presents a bright-line rule and is supported by case law, we conclude that an infamous crime is not synonymous with a felony for purposes of the Infamous Crimes Clause. We presume that the framers carefully selected each word because of its particular meaning. E.g., Nagy v. Evansville-Vanderburgh Sch. Corp., 844 N.E.2d 481, 484-85 (Ind. 2006); Eakin v. State ex rel. Capital Improvement Bd., 474 N.E.2d 62, 65 (Ind. 1985); Chadwick v. City of Crawfordsville, 216 Ind. 399, 409, 24 N.E.2d 937, 942 (1940); State ex rel. Hovey v. Noble, 118 Ind. 350, 353, 21 N.E. 244, 245 (1888). Article II, § 12, of the Constitution, which along with the Infamous Crimes Clause remains unchanged since its ratification in 1851, provides that "[i]n all cases, except treason, felony, and breach of the peace, electors shall be free from arrest, in going to elections, during their attendance there, and in returning from the same." Ind. Const. art. II, § 12 (emphasis added). Thus, if the framers had intended the

6

Infamous Crimes Clause to apply only to felonies, we presume they would have used the term "felony" instead of "infamous crime."

For its part, the State argues that the General Assembly has plenary power to define which crimes are infamous, and this too is supported by case law. In Baum, the Court concluded that, at common law, the loss of civil or political privileges, such as the right to vote, was considered an infamous punishment. 157 Ind. at 285, 61 N.E. at 673. Thus, it held that vote selling was an infamous crime because the General Assembly had provided disenfranchisement, an infamous punishment, as punishment for the crime of vote selling. Id. at 286, 61 N.E. at 674.

Under the reasoning in Baum, the General Assembly can make any crime an infamous crime subject to disenfranchisement simply by imposing the infamous punishment of disenfranchisement. This circular reasoning would effectively erase the adjective "infamous" from the Infamous Crimes Clause. That is, the General Assembly could determine that all crimes are infamous, which would render the adjective "infamous" entirely superfluous. Again, we presume that the framers carefully chose each word and intended it to have an effective meaning. E.g., Nagy, 844 N.E.2d at 484-85; Eakin, 474 N.E.2d at 65; Chadwick, 216 Ind. at 409, 24 N.E.2d at 942; Noble, 118 Ind. at 353, 21 N.E. at 245. If the framers had intended to grant such a broad power to the General Assembly, they simply would have written that "the General Assembly has power to disenfranchise any person convicted of a crime." We conclude that, by modifying "crime" with "infamous," the framers intended to limit the category of crimes subject to disenfranchisement.[3] Cf. Brady v. State, 575 N.E.2d 981, 987 (Ind. 1991) (discussing modifiers while interpreting Article I, § 13, of the Indiana Constitution).

---

[3] Alternatively, the State argues that incarceration is an infamous punishment, regardless of place or duration, and that Snyder was convicted of an infamous crime because his conviction resulted in incarceration. The main weakness to sustaining this argument stems from the fact that the State has not suggested that the Constitution limits the General Assembly to disenfranchising an incarcerated person only for the duration of incarceration. The logical endpoint of the State's argument is that the General Assembly could forever disenfranchise anyone who is ever incarcerated upon conviction. Consider the following example: A 20-year-old is convicted of Class C misdemeanor illegal possession of alcohol by a minor, I.C. § 7.1-5-7-7, and the trial court sentences him or her to an executed term of incarceration (no matter how short), I.C. § 35-50-3-4 (person convicted of Class C misdemeanor can be sentenced to imprisonment for no more than 60 days). And suppose that a second 20 year-old is convicted of the same crime arising from the same facts but the trial court, in its discretion, gives the second person a suspended sentence. There would be two persons convicted of the exact same minor offense but one would forever be disen-

7

We are thus presented with a situation where both parties' arguments are grounded firmly in our case law but equally invalid under a plain reading of the constitutional text. Therefore, we think it is prudent to start from scratch and interpret the Infamous Crimes Clause anew.

Our method of constitutional interpretation is well-established. When interpreting particular provisions of the Indiana Constitution, this Court looks to the common understandings of both those who framed it and those who ratified it. Bayh v. Sonnenburg, 573 N.E.2d 398, 412 (Ind. 1991). We are guided by the text, the history surrounding the text, and the purpose and structure of the Constitution in general. Id.; see also Price v. State, 622 N.E.2d 954, 957 (Ind. 1993).

## A-1

Like many legal maxims, the definition of "infamous crime" varies depending on the context in which it is used. It has been said that there were two types of "infamy" at common law, "the one founded in the opinions of the people respecting the mode of punishment, the other in the construction of law respecting the future credibility of the delinquent." Lord William Eden Auckland, Principles of Penal Law ch. 7, § 6, at 54 (London 1771) [hereinafter Principles of Penal Law], quoted in Ex Parte Wilson, 114 U.S. at 422. Under the first view, an infamous crime was one that subjected the criminal to an infamous punishment, and under the second view, an infamous crime was one that rendered the criminal incompetent to be a witness. And the type of infamy rendering a witness incompetent was based on the nature of the crime itself, not the nature of the punishment. See, e.g., People v. Whipple, 9 Cow. 707, 707 (N.Y. O. & T. 1827) ("[I]t is now settled . . . that it is the crime, and not the punishment, which creates the infamy, and destroys the competency of the witness." (citations omitted)); Priddle's Case, (1787)

franchised while the other would not. This would be an absurd result, and we will not interpret the Constitution to lead to an absurd result unless it undoubtedly requires us to do so. Compare Superior Constr. Co. v. Carr, 564 N.E.2d 281, 284 (Ind. 1990) ("In interpreting statutes, we attempt to prevent absurdity and hardship . . . ." (citations omitted)), with Whitcomb v. Young, 258 Ind. 127, 138, 279 N.E.2d 566, 574 (1972) ("[C]ourts should use the same rules of construction in interpreting a constitutional amendment as [are] used in construing a statute." (citing In re Todd, 208 Ind. 168, 190, 193 N.E. 865, 873 (1935))).

168 Eng. Rep. 323, 323 (K.B.) ("It is now settled, that it is the infamy of the crime which destroys the competency, and not the nature or mode of punishment."); Pendock v. Mackender, (1755) 95 Eng. Rep. 662, 662 (C.B.) (providing "that it is the crime that creates the infamy, and takes away a man's competency").

We think that this Court erred in holding that an infamous crime, for purposes of the Infamous Crimes Clause, is one for which the General Assembly affixes an infamous punishment. History demonstrates that whether a crime is infamous for purposes of determining whether it warrants the loss of civil and political rights depends on the nature of the crime itself.

The legal concept "infamy" dates back more than 2,000 years to ancient Greece, where criminals who had committed certain heinous crimes were pronounced "infamous" and thereafter "prohibited from appearing in court, voting, making speeches, attending assemblies, and serving in the army" and thus prohibited from influencing public affairs. Walter Matthews Grant et al., Special Project: The Collateral Consequences of a Criminal Conviction, 23 Vand. L. Rev. 929, 941 (1970) [hereinafter Collateral Consequences] (footnote omitted); see also Mirjan R. Damaska, Adverse Legal Consequences of Conviction and Their Removal: A Comparative Study, 59 J. Crim. L., Criminology & Police Sci. 347, 351 (1968). This practice was subsequently used in ancient Rome, and, after the fall of the Roman Empire, it was incorporated into the primitive penal systems of the Germanic tribes inhabiting both continental Europe and England, where it was called "outlawry" and "civil death."[4] Collateral Consequences, supra, at 942; Howard Itzkowitz & Lauren Oldak, Note, Restoring the Ex-Offender's Right to Vote: Background and Developments, 11 Am. Crim. L. Rev. 721, 722-23 (1973). In continental Europe, the concept survived the Middle Ages and continues to be used today, albeit to a far lesser degree. See Damaska, supra, at 351-56. But see Robin L. Nunn, Comment, Lock Them Up and Throw Away

---

[4] Outlawry and civil death both were "a form of community retaliation against the criminal," Collateral Consequences, supra, at 942, and were used "to punish those who committed particular crimes involving serious harm to the society and to compel wrongdoers to obey orders of the courts," Itzkowitz & Oldak, supra, at 722 (footnote omitted). One who had been deemed an outlaw "was expelled from the community and completely deprived of his civil rights and society's protection," id., and the consequences included being denounced as "infamous," being deprived of all rights, confiscation of all property, and exposure to injury or death, because anyone could kill an outlaw without impunity, id. at 722-23. See also Collateral Consequences, supra, at 942; Damaska, supra, at 350-51; H. Erle Richards, Is Outlawry Obsolete?, 18 L. Q. Rev. 297, 298-99 (1902).

the Vote, 5 Chi. J. Int'l L. 763 (2005) (noting the growing international consensus that criminal disenfranchisement is illegitimate). The general concept of infamy was also retained in England after the Norman Conquest of 1066 and eventually became part of "attainder," the consequences of which were forfeiture of property, corruption of blood, and loss of all civil privileges. Collateral Consequences, supra, at 942-43.

The practice of depriving certain criminals of their civil and political rights was transported here from England by our colonial predecessors, but the concept of "[c]ivil death was rejected as part of the common law" after the American Revolution. Itzkowitz & Oldak, supra, at 724-25. Nevertheless, certain civil disabilities remained, as eleven state constitutions enacted between 1776 and 1821, including the Indiana Constitution of 1816, denied or authorized the denial of voting rights to those convicted of certain crimes. Id. at 725. Moreover, disenfranchisement was used as punishment for certain crimes in the Northwest Territory and the Indiana Territory. David D. Banta, The Criminal Code of the Northwest Territory, 9 Ind. Mag. of History 234, 239-43 (1913).

As for the period after Indiana achieved statehood, the recorded debates of neither the 1816 nor the 1850 constitutional convention offer much information regarding the Infamous Crimes Clause.[5] It is clear, however, that the current provision was based on a similar provision

---

[5] During the 1850 Constitutional Convention, three resolutions of inquiry were submitted and adopted requesting that the Committee on the Elective Franchise consider including a provision regarding disenfranchisement for infamous crimes. The first two came on October 15, 1850, eight days after the Convention was first assembled. Benjamin F. Brookbank, of Union County, submitted the following: "That the Committee on the Elective Franchise be requested to report a clause or section, prohibiting any idiot or insane person, or any person convicted of an infamous crime, the exercise of the elective franchise." 1 Charles Kettleborough, Constitution Making in Indiana 244 (reprinted ed. 1971) (emphasis added); see also Journal of the Convention of the People of the State of Indiana, To Amend the Constitution 65 (1851) [hereinafter Convention Journal]. And James Lockhart, of the Posey and Vanderburgh districts, offered a similar resolution requesting that the committee report a provision providing, inter alia, "that in all elections every white male inhabitant over the age of twenty-one, having resided in this State one year next preceding any election, shall be entitled to vote at such election in the county where he resides, unless he shall have been convicted of some crime deemed infamous by law." 1 Kettleborough, supra, at 244-45 & n.18; see also Convention Journal, supra, at 65-66, 103-04.

 The report of the Committee on the Elective Franchise and the Apportionment of Representation was submitted on October 31, 1850, and it recommended that article 13 be incorporated into the Constitution. Section 4 of article 13 provided that "[t]he General Assembly shall have power to exclude from electing, or being elected, any person convicted of any infamous crime." Convention Journal, supra, at 171-72. This language was taken almost verbatim from Article VI, Section 4, of the Indiana Constitution

of the Indiana Constitution of 1816, which provided that "[t]he General Assembly shall have full power to exclude from electing, or being elected, any person convicted of any infamous crime." Ind. Const. art. VI, § 4 (1816).  Under the 1816 constitution, there existed between 1824 and the 1850 Constitutional Convention a penal statute defining which crimes were infamous and the consequences stemming from conviction of an infamous crime.  R.S. 1843, ch. 54, § 79, at 999; R.S. 1838, ch. 26, § 79, at 220; R.L. 1831, ch. 26, § 79, at 195; R.L. 1824, ch. 29, § 71, at 150. Although different versions of the statute varied in which crimes were deemed infamous, the consequences stemming from conviction of an infamous crime remained the same:  a person convicted of an infamous crime was "incapable of holding any office of trust, honor, or profit, voting at any election, serving as a juror, or giving evidence in any court of justice."  R.S. 1843, ch. 54, § 79, at 999.

This history not only demonstrates that disenfranchisement (along with the loss of other civil and political rights) was itself an infamous punishment, but it also suggests that, for purposes of the Infamous Crimes Clause, an infamous crime is one which by its own nature is infamous, irrespective of punishment.  Cf. Principles of Penal Law, supra, § 3, at 51-52 ("Corporal punishments, immediately affecting the body, and publickly [sic] inflicted, ought to be infamous in the estimation of the people; so should degradations from titles of honor, civil incapacities, brandings, and public exhibitions of the offender:  all which penalties should be applied with great caution, and only to offences infamous in their nature." (emphases added)).  As explained

of 1816.  The Committee's report was concurred in and the article was read a first time and passed to a second reading.  Id. at 172.

On November 23, 1850, about three weeks after the first reading of article 13, Robert H. Milroy, of Carroll County, submitted yet a third resolution pertaining to suffrage and infamous crimes, which requested that the committee report on, inter alia, a provision "requiring the Legislature to pass laws excluding from the rights of suffrage all persons who have been, or may be, convicted of bribery, of larceny, or any infamous crime."  Id. at 287; see also 1 Kettleborough, supra, at 249.  Although this resolution was adopted as a resolution of inquiry, the language of article 13 was not altered between the first and final reads.  2 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1306 (1850).

During the second reading of article 13, on December 24, 1850, section 1 prompted vigorous debate, id. at 1295-1306, but several sections, including section 4, did not and were engrossed for a third reading without comment, id. at 1306.  On December 26, 1850, article 13 was passed and referred to the Committee on Revision, Arrangement, and Phraseology.  Id. at 1312; Convention Journal, supra, at 532. Then, on February 5, 1851, Robert Dale Owen, of Posey County, submitted to the Convention a Report from the Committee on Revision, Arrangement, and Phraseology that contained the subsequently ratified and current version of Article II, § 8.  Convention Journal, supra, at 908-13.

supra, one type of infamy at common law rendered a witness incompetent to testify and was determined by the nature of the crime itself.  The penal statute that existed under the 1816 Constitution treated the right to serve as a witness and submit evidence in court as a political right on par with the right to vote, the right to hold public office, and the right to serve as a juror.  Cf. State v. Rezendes, 253 A.2d 233, 234 (R.I. 1969) ("At common law an infamous crime was regarded as an offense which brought infamy upon the person convicted, in that after conviction he was incompetent to testify as a witness or was deprived of his political rights." (emphasis added)).

Although the modern analog to the witness-incompetency rule primarily is justified by the credibility of a witness's testimony, Ind. Evidence Rule 609 (adopted effective Jan. 1, 1994); cf. Hatchett v. State, 503 N.E.2d 398, 404 (Ind. 1988) ("Only those crimes which reflect on the witness' propensity to tell the truth are relevant to a general attack on his character."), the origins and effect of this common-law rule demonstrate its relation to disenfranchisement.  Originally, the common-law incompetency rule was justified as part of the punishment imposed on the offender.  See 1 John Henry Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 519, at 648 (1904) [hereinafter 1 Wigmore on Evidence] ("No doubt, [rendering incompetent only those actually convicted of an infamous crime instead of those who committed an infamous crime] rested to some extent on the notion of disqualification as a part of the punishment for the crime, i.e.[,] that the degradation, which by these social standards must follow immediately upon public judgment of guilt, should naturally involve an exclusion from equal status in the witness-box.").  But this justification was flawed because the rule punished not only the convict but any other person who might need his or her testimony, so the rule came to be justified on the ground that one who commits a heinous crime cannot be trusted to adhere to an oath or speak the truth.  Id.

Additionally, the common-law rule did much more than the modern impeachment rule by rendering the convict wholly incompetent.  One of the consequences of closing the witness box to a convict was "that crimes, all imaginable crimes, [might] be committed with impunity, with sure impunity, on his person and in his presence."  5 Jeremy Bentham, Rationale of Judicial Evidence 84-85 (London, Hunt & Clarke 1827), quoted in 1 Wigmore on Evidence, supra, § 519, at 649.  Thus, rendering a convict incompetent to be a witness was similar to disenfranchisement in

that the convict was prevented from raising his rights and participating in government. See also 1 Wayne R. LaFave, Substantive Criminal Law § 1.6(d), at 57 (2d ed. 2003) ("Where the purpose was in former times to render a witness incompetent . . ., the term 'infamous' properly has reference to those crimes involving fraud or dishonesty or the obstruction of justice . . . . Where the term is used in connection with disbarment or disqualification to hold office, vote or serve on a jury, it generally has a similar meaning. (footnote omitted)); 1 Francis Wharton, A Treatise on Criminal Law § 22a, at 33 (Philadelphia, Kay & Brother 9th ed. 1885) ("At common law, 'infamy' was held to attach to all crimes, a conviction of which impressed such a moral taint on the perpetrator as was supposed to require his incapacitation as a witness, and the suppression of his political rights." (footnote omitted)).

History thus demonstrates that whether a crime is infamous for purposes of the Infamous Crimes Clause depends not on the nature of the punishment but on the nature of the crime itself.

**A-2**

Ordinarily, the doctrine of stare decisis requires that we apply "a principle of law which has been firmly established." Marsillett v. State, 495 N.E.2d 699, 704 (Ind. 1986). It is a maxim of judicial restraint supported by compelling policy reasons of predictability that we should be "reluctant to disturb long-standing precedent," id., and "a rule which has been deliberately declared should not be disturbed by the same court absent urgent reasons and a clear manifestation of error," id. at 704-05 (citation omitted). But this Court will overrule prior decisions where they "are clearly incorrect due to a mistaken conception of the law or other judicial error." Id. at 704 (citations omitted).

We think that history establishes that an infamous crime for purposes of the Infamous Crimes Clause is one that is by its nature infamous, irrespective of punishment. We would be more hesitant to depart from more than a century of precedent if this was the only problem, but additional reasons persuade us that our departure from this rationale is warranted.

13

First, the Court's analysis in <u>Crum</u>, <u>Baum</u>, and <u>Crampton</u> was perfunctory at best and seemingly adopted federal jurisprudence as a matter of course. But, of course, federal constitutional jurisprudence has no binding effect when interpreting the Indiana Constitution. This is particularly so in the present context, given that the Supreme Court's interpretation of the Grand Jury Clause did not occur until 1885, more than 30 years after the Indiana Constitution was adopted.[6] <u>Cf.</u> <u>State v. Oldner</u>, 206 S.W.3d 818, 823 (Ark. 2005) (declining to follow <u>Ex Parte Wilson</u> in interpreting state constitutional provision rendering ineligible for office persons convicted of infamous crime in part because that decision was decided more than a decade after the state constitution was drafted).

Second, the federal Grand Jury Clause and our Constitution's Infamous Crimes Clause are in no way related, and the rationale for interpreting the Grand Jury Clause with a view toward the potential punishment is absent under the Infamous Crimes Clause. Requiring indictment by a grand jury as a precondition to prosecuting the accused protects individuals from being forced to defend themselves against unfounded and overzealous prosecutions. <u>See, e.g.</u>, <u>Butler v. Wentworth</u>, 24 A. 456, 457 (Me. 1891) (describing grand jury "as one of the securities to the innocent against hasty, malicious, and oppressive public prosecutions, and as one of the ancient immunities and bulwarks of personal liberty"); <u>cf.</u> <u>United States v. Colt</u>, 126 F.3d 981, 984 (7th Cir. 1997) (Kanne, J.) ("Although the grand jury was first instituted in England to aid the Crown in the prosecution of criminals, it had over time developed into a safeguard of individual rights." (citation omitted)). Therefore, considering the nature of the potential punishment, rather than the nature of the crime itself, is jurisprudentially sound because as the potential for greater deprivations of liberty increases, so too does the need for the protective machinery of the grand jury. Disenfranchising a convict, however, by definition occurs after the conviction when the rationale for protecting liberty has evaporated.

---

[6] To be sure, the Fifth Amendment was adopted long before the Indiana Constitution, but, prior to 1885, many federal courts had looked to the nature of the crime itself in determining whether indictment by a grand jury was required. <u>E.g.</u>, <u>United States v. Yates</u>, 6 F. 861, 866 (E.D.N.Y. 1881); <u>United States v. Block</u>, 24 F. Cas. 1174, 1175-76 (D. Or. 1877); <u>see</u> <u>also</u> <u>Ex Parte Wilson</u>, 114 U.S. at 425 (collecting cases); J.A. Kerr, <u>Infamous Crimes</u>, 1 Am. L.J. 94, 94-95 (1884) (collecting cases).

We hold that whether an offense is an infamous crime for purposes of the Infamous Crimes Clause of the Indiana Constitution depends on the nature of the offense, not on the nature of the punishment. We therefore overrule this Court's decisions in <u>Crum</u>, <u>Baum</u>, and <u>Crampton</u> insofar as they are grounded in the infamous nature of the punishment affixed to the respective crimes involved. We similarly disapprove of the decisions in <u>Wilson</u> and <u>Taylor</u> to the same extent. We do not, however, decide the validity of the essential holdings in those cases, and it may be that the particular crimes involved in those cases are by their nature infamous.

## B

The conclusion that what constitutes an infamous crime is determined by the nature of the crime itself, rather than the nature of the punishment, merely begins the analysis. We still need to consider which crimes are by their nature infamous and to determine whether misdemeanor battery falls within that category.

### B-1

Snyder argues that misdemeanor battery is not an infamous crime because conviction thereof would not have rendered a witness incompetent at common law. In other words, he contends that an infamous crime for purposes of the Infamous Crimes Clause should be interpreted to be consistent with the common law of evidence. This argument has some strength in light of the historical connection between disenfranchisement and witness incompetency. <u>See</u> Part I-A-1, <u>supra</u>.

At common law, a person was rendered infamous and therefore incompetent to serve as a witness if he or she was convicted of treason,[7] felony, or any species of <u>crimen falsi</u>.[8] <u>E.g.</u>, <u>Unit-</u>

---

[7] In England, treason was different from felony because the lands of a traitor were forfeited to the King, whereas the lands of a felon were forfeited to his overlord. 1 LaFave, <u>supra</u>, § 1.6(a) n.1, at 48.

[8] The term <u>crimen falsi</u> is borrowed from Roman law, <u>Butler</u>, 24 A. at 458, where "it included every species of fraud and deceit or wrong involving falsehood," <u>Block</u>, 24 F. Cas. at 1175. Some courts found this to be too broad and held that an offense in the nature of <u>crimen falsi</u> is one that involves falsity or dishonesty only where "the falsehood is calculated to injuriously affect the public administration of jus-

ed States v. Block, 24 F. Cas. 1174, 1175 (D. Or. 1877); Ex Parte Westenberg, 139 P. 674, 679 (Cal. 1914); Drazen v. New Haven Taxicab Co., 111 A. 861, 862 (Conn. 1920); Commonwealth v. Dame, 62 Mass. (8 Cush.) 384, 384 (1851); Little v. Gibson, 39 N.H. 505, 510 (1859); Whipple, 9 Cow. at 707; 1 Wigmore on Evidence, supra, § 520, at 651. The Pennsylvania Supreme Court has adopted this test in interpreting a provision of the Pennsylvania Constitution providing that "[n]o person hereafter convicted of embezzlement of public moneys, bribery, perjury or other infamous crime, shall be eligible to the General Assembly, or capable of holding any office of trust or profit in this Commonwealth." Pa. Const. art. II, § 7 (emphasis added). Under this provision, an infamous crime is one in which "its underlying facts establish a felony, a crimen falsi offense, or a like offense involving the charge of falsehood that affects the public administration of justice." Commonwealth ex rel. Baldwin v. Richard, 751 A.2d 647, 653 (Pa. 2000) (footnote omitted); see Commonwealth v. Shaver, 3 Watts & Serg. 338, 342 (Pa. 1842) (articulating original definition); see also Commonwealth ex rel. Corbett v. Griffin, 946 A.2d 668, 674-75 (Pa. 2008) (all felonies are infamous crimes). At least one other court has interpreted infamous crime, as used in a criminal disenfranchisement provision of a state constitution, to include treason, felony, and crimen falsi offenses. See Barker v. People, 20 Johns. 457, 460-61 (N.Y. Sup. Ct. 1823) (holding that conviction of dueling was not an infamous crime under former state constitutional provision disenfranchising persons convicted of an infamous crime but concluding that the right to hold public office was separate from the right of suffrage).

We decline to follow this approach, primarily because the general common law applicable to witness incompetency, so far as we can tell, has never been the law in Indiana. See, e.g., Glenn v. Clore, 42 Ind. 60, 61-62 (1873) (holding that assault and battery with intent to commit rape was not an infamous crime that would have rendered a witness incompetent at Indiana common law and therefore conviction thereof could not be used to impeach the credibility of a witness); Alfred Moore, A Treatise on Indiana Criminal Law and Criminal Procedure § 365 n.5, at 447 (Chicago, Callaghan & Co. 1879) (noting that it was unclear which crimes were infamous, though it was not all felonies, but that § 79 of the Code of 1843 listed nine infamous crimes that would have rendered a witness incompetent under the old law). Rather, this Court has held that

---

tice, as perjury or the suppression of testimony." Id.; accord State v. Randolph, 24 Conn. 363, 365 (1856); Utley v. Merrick, 52 Mass. (11 Met.) 302, 303 (1846).

there are only nine infamous crimes that would have rendered a witness incompetent to testify under Indiana law: treason, murder, rape, kidnapping, wilful and corrupt perjury, arson, robbery, burglary, and forgery.[9] Ashton v. Anderson, 258 Ind. 51, 62-63, 279 N.E.2d 210, 216-17 (1972); see also Evid. R. 609(a). The "infamous crimes" under our rules of evidence stem from the 1843 Infamous Crimes Statute, Ashton, 258 Ind. at 56-57, 62-63, 279 N.E.2d at 213, 217, under which a person convicted of an enumerated crime was incompetent to serve as a witness, disenfranchised, ineligible to hold public office, and ineligible to serve as a juror.

Although the 1843 statute defined infamous crime and included disenfranchisement along with witness incompetency as a consequence of conviction, we decline to adopt the crimes enumerated in that statute as the proper interpretation of the Infamous Crimes Clause of the Constitution. The 1843 Revised Statutes made several crimes not listed as "infamous" punishable by disenfranchisement alone. See R.S. 1843, ch. 54, § 15, at 963 (grand larceny); id. § 16, at 963 (petit larceny); id. § 19, at 964 (receipt of stolen property, if principal were disenfranchised); id. § 22, at 964-65 (altering brands or marks on certain animals with intent to steal); id. § 34, at 968 (professional gambling); id. § 77, at 976 (malicious prosecution); see also R.S. 1843, ch. 5, § 158, at 153 (voter fraud). Under the 1843 statutes, crimes such as malicious prosecution and voter fraud were not deemed "infamous" because conviction thereof did not result in the loss of all the civil and political rights mentioned in the Infamous Crimes Statute – conviction resulted only in disenfranchisement. But this does not mean that malicious prosecution and voter fraud were not infamous crimes for purposes of Article VI, § 4, of the 1816 Constitution.

Furthermore, the crimes listed as infamous under the 1843 statute were not punishable by disenfranchisement under the 1852 Revised Statutes, the first statutes enacted under the 1851 Constitution. The only crimes punishable by disenfranchisement were grand larceny, 2 R.S. 1852, pt. 3, ch. 5, § 19, at 403-07; petit larceny, id. § 20, at 408-09; receipt of stolen property, id.

---

[9] Indiana evidence law also permits impeachment of witnesses with a prior conviction of a crime involving dishonesty or false statement, Evid. R. 609(a), but the justification for doing so relates to witness credibility and we have not considered such crimes to be "infamous." Ashton, 258 Ind. at 62-63, 279 N.E.2d at 216-17; see, e.g., Lamb v. State, 511 N.E.2d 444, 446 n.2 (Ind. 1987) ("In Ashton, this Court held that the only prior convictions with which a witness normally may be impeached are crimes which would have rendered a witness incompetent at common law and those involving dishonesty and false statement." (emphasis added)); id. at 446 ("[T]he crime of assault and battery with intent to kill is not one of the nine 'infamous' crimes nor is it, on its face, a crime of dishonesty or false statement.").

§ 22, at 409; altering brands or marks on certain animals with intent to steal, id. § 25, at 409; professional gambling, id. § 38, at 417-18; malicious prosecution, 2 R.S. 1852, pt. 3, ch. 6, § 18, at 432-33; voting or attempting to vote twice, id. § 57, at 442; and making threats or offering a reward to procure election, id. § 61, at 442. Unlike the statutes between 1824 and the Constitutional Convention of 1850, the 1852 criminal code did not define which crimes were deemed infamous, nor did the 1852 election code, see 1 R.S. 1852, ch. 31, § 23, at 263 (disenfranchising persons convicted of an infamous crime but not defining the term).

**B-2**

The fact that the General Assembly in 1843 listed these nine crimes as infamous does not a fortiori transform them into a constitutional test.[10] Also important is what those who ratified the Constitution understood it to mean. E.g., Richardson v. State, 717 N.E.2d 32, 38-39 (Ind. 1999). We therefore consider the plain meaning of the term "infamous." Cf. Ajabu v. State, 693 N.E.2d 921, 929 (Ind. 1998) (considering the contemporary plain meaning of "compel" to interpret the Self-Incrimination Clause of the Indiana Constitution). The contemporary plain meaning of "infamous" in the mid-nineteenth century was "most vile; base; detestable." Noah Webster, A Dictionary of the English Language 202 (rev. ed. 1850). This definition suggests that the category of infamous crimes was intended to be a narrow one – i.e., of all possible crimes, only the "most vile" qualify as infamous under this plain meaning. But what does "most vile" mean in this context? To answer this we need to consider the purpose of the Infamous Crimes Clause.

As discussed above, disenfranchisement historically was an infamous punishment imposed on offenders convicted of certain heinous crimes, and this practice was justified primarily on the penological theory of retribution, though it also was thought to serve the theory of deterrence. Collateral Consequences, supra, at 942; see also Damaska, supra, at 351 ("Infamy, similar

---

[10] Unlike the crimes listed in the 1843 statute, the crimes listed in the 1824 statute might be considered infamous for purposes of the Infamous Crimes Clause. The statute listed treason, murder, rape, kidnapping, and wilful and corrupt perjury as infamous crimes, R.L. 1824, ch. 29, § 71, at 150, and subsequent versions of the statute simply added to this list, R.L. 1831, ch. 26, § 79, at 195 (adding arson); R.S. 1843, ch. 54, § 79, at 999 (adding robbery, burglary, and forgery). Thus, these crimes were deemed infamous by statute for the 26 years preceding the 1850 Convention. In other words, an entire generation of Hoosier voters had never known those crimes not to be infamous. But not all of them constitute infamous crimes when the purpose of the Infamous Crimes Clause is considered. See infra.

18

in consequences to that found in Athens, seems to have been a widespread way of degrading citizens convicted of certain crimes involving moral turpitude.").  Under this rationale, "most vile" likely would mean crimes involving grave moral depravity and a callous indifference to the rights of the crime's victim(s).  If the Infamous Crimes Clause embodies the traditional rationale of disenfranchisement and civil death, then it would be sensible to impose such a severe form of punishment on the most severe morally deprived criminals.  But this test is highly problematic because it is too closely analogous to the definition of "felony" (which we have rejected as the meaning of infamous crime).  See Part I, supra.  Moreover, would it include only crimes that are mala in se and not crimes that are mala prohibita, a distinction laced with its own ambiguities?  1 LaFave, supra, § 1.6(b), at 51-55.  Who determines whether a crime is morally "most vile"?  Do the particular facts of the crime matter – i.e., would only some, but not all, murders, rapes, and kidnappings be infamous?  Is it possible to establish judicially manageable neutral principles in furtherance of such an understanding?

We do not answer these questions because we conclude that the Infamous Crimes Clause was not intended to be used primarily as a retributive or deterrent mechanism of punishment.  It is a cardinal principle of constitutional interpretation that our Constitution should be interpreted as a whole.  E.g., Tucker v. State, 218 Ind. 614, 639, 35 N.E.2d 270, 279 (1941); In re Petition to Transfer Appeals, 202 Ind. 365, 376, 174 N.E. 812, 817 (1931).  Article I, § 18, of the Constitution provides that "[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice."  Ind. Const. art. I, § 18.  Interpreting the Infamous Crimes Clause as authorizing the General Assembly to use a particular punishment solely for the purpose of exacting vindictive justice would conflict with this provision of the Indiana Bill of Rights.  And we will avoid reading such a conflict into the Constitution unless the document itself clearly requires us to do so.

We think instead that the Infamous Crimes Clause is properly understood primarily as a regulatory measure.  While history clearly demonstrates its punitive characteristics, its primarily regulatory character is clearly demonstrated by its placement in Article II, which seeks to regulate suffrage and elections, and the justification underlying criminal disenfranchisement provi-

sions generally.  Cf. Trop v. Dulles, 356 U.S. 86, 96-97 (1958) (plurality opinion) (noting that disenfranchising a convict is "a reasonable ground of eligibility for voting").

The most common regulatory justification for criminal disenfranchisement provisions is that they preserve the integrity of elections.  Bailey v. Baronian, 394 A.2d 1338, 1343 (R.I. 1978).  In other words, criminal disenfranchisement protects "the purity of the ballot box."  In Washington v. State, the Alabama Supreme Court reasoned that it was proper to disenfranchise criminals because their convictions demonstrated that they were too morally corrupt to exercise the esteemed privilege of suffrage, and that allowing such immoral people to vote would compromise our form of government.  75 Ala. 582, 585 (1884).

The California Supreme Court adopted the same justification but articulated a narrower standard in Otsuka v. Hite, 414 P.2d 412 (Cal. 1966).  In that case, the plaintiffs were conscientious objectors who had been convicted during World War II of violating the Selective Service and Training Act of 1940 and had served their respective terms of imprisonment.  Id. at 414-15.  About 20 years after completing their sentences, they attempted to register as voters but were turned away on the basis of their prior convictions, in accordance with a provision of the California Constitution that provided that "'no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector in this State.'"  Id. at 414 n.1 (emphasis added).

Although the California Supreme Court found the criminal disenfranchisement provision justified by the purity-of-the-ballot-box rationale of the Alabama Washington case, id. at 417, the constitutional standard it articulated was narrower.  Under the Washington court's reasoning, most convicted criminals are deemed to be too morally corrupt to vote on the basis that since they have committed crimes of moral turpitude in the past they are likely to commit election fraud.  Washington, 75 Ala. at 585; cf. Green v. New York City Bd. of Elections, 380 F.2d 445, 451 (2d Cir. 1967) (noting recidivism rates).  The Otsuka court, however, held that the California Constitution disenfranchised convicted criminals only if a closely drawn nexus existed between the elements of the crime and the risk to the integrity of elections – i.e., only convicts who reasonably may have been deemed to pose an actual bona fide threat to the integrity of elections could be disenfranchised.  414 P.2d at 422.  Applying this standard, the defendants had not been

20

convicted of an infamous crime because violating the Selective Service Act as a conscientious objector was not a crime "involving moral corruption and dishonesty, thereby branding their perpetrator as a threat to the integrity of the elective process." Id. at 414, 422-25.

Given our conclusion that, from the placement of Article II, § 8, in the Suffrage and Elections article of the Constitution and the disapproval in our Bill of Rights of punishment that exacts vindictive justice, the purpose of the Infamous Crimes Clause is primarily to preserve the integrity of elections, we find the Otsuka standard more consistent with our own Constitution than the Washington standard. We hold that an infamous crime is one involving an affront to democratic governance or the public administration of justice such that there is a reasonable probability that a person convicted of such a crime poses a threat to the integrity of elections. These types of crimes are "most vile" in that they undermine the system of government established by our Constitution. Persons committing such crimes may be presumed to pose a bona fide risk to the integrity of elections. An infamous crime may include some felonies and some misdemeanors, but crimes marked by gross moral turpitude alone are not sufficient to render a crime infamous for purposes of the Infamous Crimes Clause.

Prototypical examples of infamous crimes are treason, perjury, malicious prosecution, and election fraud, all of which were subject to disenfranchisement for at least 26 years prior to the 1850 Convention, see R.L. 1824, ch. 29, § 71, at 150; id. § 31, at 144; R.L. 1824, ch. 35, § 6, at 167; R.S. 1843, ch. 54, § 79, at 999; R.S. 1843, ch. 53, § 77, at 976; R.S. 1843, ch. 5, § 158, at 153. Although most of these examples involve elements of deceit and dishonesty, cf. Oldner, 206 S.W.3d at 822 (holding that an infamous crime under the Arkansas Constitution is a crime "involving elements of deceit and dishonesty"), the critical element is that they attempt to abuse or undermine our constitutional government. This test conforms to the overall structure of the Constitution. In effect, the Infamous Crimes Clause authorizes the General Assembly to disenfranchise permanently those who compromise the integrity of our elections.

It is clear that Snyder was <u>not</u> convicted of an infamous crime. The General Assembly has not enacted a statute classifying Class A misdemeanor battery as an infamous crime based on the nature of the crime. Rather, the statute under which Snyder was disenfranchised arguably classifies infamous crimes based on the nature of the punishment – i.e., incarceration.

Even had the General Assembly attempted to classify this crime as infamous, we do not think that misdemeanor battery, as defined by statute, is by its nature an infamous crime. In Indiana, a person commits Class A misdemeanor battery if he or she "knowingly or intentionally touches another person in a rude, insolent, or angry manner" <u>and</u>:

> (A) it results in bodily injury to any other person;
> (B) it is committed against a law enforcement officer or against a person summoned and directed by the officer while the officer is engaged in the execution of the officer's official duty;
> (C) it is committed against an employee of a penal facility or a juvenile detention facility (as defined in IC 31-9-2-71) while the employee is engaged in the execution of the employee's official duty;
> (D) it is committed against a firefighter (as defined in IC 9-18-34-1) while the firefighter is engaged in the execution of the firefighter's official duty;
> (E) it is committed against a community policing volunteer:
> > (i) while the volunteer is performing the duties described in IC 35-41-1-4.7; or
> > (ii) because the person is a community policing volunteer; or
> (F) it is committed against the state chemist or the state chemist's agent while the state chemist or the state chemist's agent is performing a duty under IC 15-16-5.

I.C. § 35-42-2-1(a)(1).

The circumstances surrounding Snyder's conviction are unclear because there is no record in this case, but it is clear from the statutory scheme that a conviction for Class A misdemeanor battery has no bearing upon the integrity of the election process. There is nothing to suggest that Snyder battered an election official, and, even had he done so, it is questionable whether it would pose the type of risk to the integrity of elections that would justify disenfranchisement. In short, Snyder was not convicted of an infamous crime.

**II**

The fact that Snyder was convicted of a non-infamous crime does not necessarily lead to the conclusion that disenfranchising him for the duration of incarceration violated the Indiana Constitution. The parties have proceeded under the unspoken assumption that the Infamous Crimes Clause applies to this case. This likely is based, at least in part, on the wording of the Prisoner Disenfranchisement Statute, which provides that "[a] person who is (1) convicted of a crime; and (2) imprisoned following conviction; is deprived of the right of suffrage by the general assembly pursuant to Article 2, Section 8 of the Constitution of the State of Indiana." I.C. § 3-7-13-4(a) (emphasis added).

The Indiana Constitution has not been violated here. The General Assembly exercises its power under the Infamous Crimes Clause when it affixes disenfranchisement as a distinct punishment for conviction of an infamous crime. See Dorsey v. State, 179 Ind. 531, 537-38, 100 N.E. 369, 372 (1913) (distinguishing between statute affixing disenfranchisement as punishment for infamous crimes pursuant to Article 2, Section 8, and statute disenfranchising persons imprisoned upon conviction regardless of crime or punishment). Under those circumstances, the trial court imposes disenfranchisement as a part of the sentence. Cf. I.C. § 35-50-5-1.1(a) ("Whenever a person is convicted of a misdemeanor under IC 35-44-1, the court may include in the sentence an order rendering the person incapable of holding a public office of trust or profit for a fixed period of not more than ten (10) years.").

The statute under which Snyder was disenfranchised did not confer power on trial courts to impose disenfranchisement as part of Snyder's sentence. Rather, the General Assembly simply has provided that persons convicted of a crime and consequently incarcerated are deprived of the right to vote while they are incarcerated. In short, Snyder was not disenfranchised pursuant to the Infamous Crimes Clause.

The essential question remains: Does the General Assembly have power under our Constitution to disenfranchise a person convicted of a crime and sentenced to an executed term of incarceration, for the duration of incarceration?

**A**

Snyder argues that because the Constitution gives the General Assembly power to disenfranchise those convicted of infamous crimes it necessarily implies that the General Assembly lacks power to disenfranchise any person not so convicted. We disagree. As explained above, the Infamous Crimes Clause authorizes the General Assembly to affix disenfranchisement as a distinct punishment for conviction of an infamous crime. It is therefore necessarily implied that the General Assembly cannot affix disenfranchisement as a punishment for a non-infamous crime. See, e.g., State ex rel. Thomas v. Williams, 238 Ind. 407, 419, 151 N.E.2d 499, 504 (1958) (opinion of Emmert, J.) ("In construing constitutional provisions, a rule of general acceptance is that which is expressed makes that which is silent cease." (citations and internal quotation marks omitted)). But this says nothing about the issue presented here, where the General Assembly is acting outside the Infamous Crimes Clause.

The penal system contemplates that persons imprisoned upon conviction for any crime can be disenfranchised for the period of incarceration. It is simply an incident to or a collateral consequence of such incarceration. The person has been found guilty beyond a reasonable doubt and the trial court has concluded that the crime and the criminal warrant the deprivation of the criminal's physical liberty. Although a prisoner does not forfeit all constitutional rights, one who is incarcerated loses many rights enjoyed by non-incarcerated persons. Hudson v. Palmer, 468 U.S. 517, 523-24 (1984); see also Owens v. Barnes, 711 F.2d 25, 27-28 (3d Cir. 1983) ("'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" (quoting Hewitt v. Helms, 459 U.S. 460 (1983), in turn quoting Price v. Johnston, 334 U.S. 266, 285 (1948))). The General Assembly's police power permits it to affix terms of incarceration for violating our criminal laws. We think it also permits the General Assembly to disenfranchise an incarcerated convict as a collateral consequence of imprisonment. In other words, the General Assembly can

24

"decide that one of the losses, in addition to the basic deprivation of liberty, to which a prisoner who is incarcerated should be subject is that of participation in the democratic process which governs those who are at liberty." Owens, 711 F.2d at 28.

At various points, Snyder has argued that Indiana is alone in disenfranchising convicted prisoners. On the contrary, "[t]he nation seems to be nearing a consensus that the presently incarcerated should not have the right to vote." Developments in the Law – The Law of Prisons: One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L. Rev. 1838, 1939, 1942 (2002) (footnote omitted). The only states that allow convicted prisoners to vote are Maine and Vermont; the remaining 48 states and the District of Columbia preclude at least some incarcerated prisoners from voting. Id. at 1942 n.20; see also Simmons v. Galvin, 575 F.3d 24, 30-31 (1st Cir. 2009). It appears that most states disenfranchise only incarcerated felons, see, e.g., Simmons, 575 F.3d at 28 (Massachusetts law disenfranchising only incarcerated felons), but several states, either by their constitutions or their statutes, disenfranchise all prisoners convicted of any crimes, see Idaho Const. art. VI, § 3; Ill. Const. art. III, § 2; Ky. Const. § 145; Mich. Const. art. II, § 2; S.C. Const. art. II, § 7; Mo. Ann. Stat. § 115.133(2)(1) (West 1997 & Supp. 2011). Moreover, the Model Penal Code, which was drafted by the American Law Institute in 1962, calls for disenfranchisement of convicted prisoners, but only for the duration of incarceration. See Model Penal Code: Official Draft and Explanatory Notes § 306.3, at 256 (1985). We also note that the first iteration of the Indiana Prisoner Disenfranchisement Statute now challenged was enacted during a Special Session of the General Assembly in 1881. See Act of Apr. 21, 1881, ch. 47, § 4, 1881 Ind. Laws 482, 482 (codified at 1 R.S. 1896, § 4681).

Snyder's argument implies that the Indiana Constitution compels the General Assembly either to release imprisoned convicts on Election Day so that they may vote at the polls, to provide polling places at the myriad correctional and jail facilities throughout the State, or to provide incarcerated convicts with absentee ballots. History negates this implication. Under the 1852 election code, elections were all in person and by ballot. 1 R.S. 1852, ch. 31, §§ 5, 16-19, at 261, 262. No provision existed requiring the County Sheriff or the State Prison Warden to transport convicted prisoners to their respective precincts so that they might vote. In short, Snyder has not pointed to any historical evidence suggesting that convicted prisoners in Indiana

were permitted to vote around the time the Constitution was ratified, and the applicable statutes of the time provide no mechanism by which such persons could have voted. Moreover, we perceive no state constitutional requirement that the General Assembly extend the absentee ballot to convicted prisoners. Cf. Griffin v. Roupas, 385 F.3d 1128 (7th Cir. 2004) (Posner, J.) (holding that the federal constitution does not require states to permit unlimited absentee voting).

In sum, the General Assembly may exercise its police power to deprive all convicted prisoners of the right to vote for the duration of their incarceration. A convicted prisoner is different from a pretrial detainee, who has yet to have his or her day in court. The loss of political and civil rights upon conviction and imprisonment is simply a collateral consequence thereof.

**B**

Snyder also argues that disenfranchising misdemeanants, even while incarcerated, violates the Equal Protection Clause of the Fourteenth Amendment and that we should interpret the Indiana Constitution in a way that does not violate the federal constitution. This argument was raised for the first time in Snyder's response brief, which was filed simultaneously with the State's response, so the State was not given an opportunity to address this argument in its briefs.

In addition, there is nothing in the language of the certified question asking us to address the relationship, if any, between the state constitutional question at hand and the federal constitution, nor do we perceive any need for us to do so. Under these circumstances, we think it proper for us to focus on the Indiana Constitution and leave interpretation of the Equal Protection Clause to Judge Lawrence.

**C**

We hold that the Indiana General Assembly has authority under its general police power to disenfranchise persons incarcerated upon conviction of a crime, so long as the disenfranchisement lasts only for the duration of incarceration. That the statute cites the Infamous Crimes Clause as the basis for its enactment, instead of the general police power, does not render it inva-

26

lid. This language in no way affects the purpose or effect of the statute, and we will not invalidate an otherwise constitutional statute merely because it includes an unnecessary statement of authority.

**III**

Finally, the troubling posture of this case warrants further comment. As we have noted before, addressing an issue of state constitutional law in the context of a certified question contravenes at least two fundamental principles of the judicial function. See Citizens Nat'l Bank of Evansville v. Foster, 668 N.E.2d 1236, 1241-42 (Ind. 1996).

First, it is a cardinal principle of the judicial function that we will pass upon the constitutionality of a coordinate branch's action only when it is absolutely necessary to do so. More than a century ago, this Court stated:

> [C]ourts will not pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. This court has repeatedly held that questions of this character will not be decided unless such decision is absolutely necessary to a disposition of the cause on its merits.

State v. Darlington, 153 Ind. 1, 4, 53 N.E. 925, 926 (1899) (citations omitted); accord Ind. Wholesale Wine & Liquor Co., Inc. v. State ex rel. Ind. Alcoholic Beverage Comm'n, 695 N.E.2d 99, 106-08 (Ind. 1998); Citizens Nat'l Bank, 668 N.E.2d at 1241; Sonnenburg, 573 N.E.2d at 402. This doctrine also is rooted firmly in the U.S. Supreme Court's jurisprudence. E.g., Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11-12 (2004); Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988); Rescue Army v. Los Angeles Municipal Court, 331 U.S. 549, 568-85 (1947); Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring). See generally Alexander M. Bickel, The Least Dangerous Branch 111-98 (1962) (describing the Supreme Court's use of certain "passive virtues" to decline jurisdiction in certain circumstances). The doctrine of "strict necessity" or "constitutional avoidance" "flows from 'the unique place and character, in our scheme, of judicial review of

governmental action for constitutionality.'" Citizens Nat'l Bank, 668 N.E.2d at 1241 (quoting Rescue Army, 331 U.S. at 571).

A second cardinal principle of the judicial function is that courts should not issue advisory opinions but instead should decide cases only on the specific facts of the particular case and not on hypothetical situations. Id.; accord Ashwander, 297 U.S. at 347-48. This has been the nature of the American judiciary since the earliest days of the Republic. See Paul M. Bator et al., Hart and Wechsler's the Federal Courts and the Federal System 65-67 (3d ed. 1988) (reprinting correspondence from 1793 between Secretary of State Thomas Jefferson and the justices of the U.S. Supreme Court wherein the justices declined to answer extrajudicial questions posed by the President because to do so would jeopardize the separation-of-powers scheme contemplated by the federal constitution).[11] Requiring issues to develop concreteness through the adversarial process "accords the deference due to 'the judgment of other repositories of constitutional power concerning the scope of their authority.'" Citizens Nat'l Bank, 668 N.E.2d at 1241 (quoting Rescue Army, 331 U.S. at 571). This principle is expressed in justiciability doctrines such as standing and mootness. See, e.g., Pence v. State, 652 N.E.2d 486, 488 (Ind. 1995) ("The standing requirement mandates that courts act in real cases, and eschew action when called upon to engage only in abstract speculation."); Ind. Bureau of Motor Vehicles v. Zimmerman, 476 N.E.2d 114, 118 (Ind. 1985) ("A court also should not decide an issue when there is no cause or controversy before it since any judgment entered thereon would be advisory and not dispositive of anything.").

Admittedly, certified questions are by their nature quasi-advisory in that the entire case is not before this Court. Our answer to a certified question simply "advises" the federal court on an issue of Indiana law, and it may or may not be dispositive of the entire case. But accepting a certified question on state constitutional law, particularly where there is no record, implicates greater concerns related to the constitutional function of this Court.

---

[11] To be sure, some state courts are permitted by their respective laws to issue purely advisory opinions. See, e.g., In re Request of the Governor for an Advisory Opinion, 950 A.2d 651 (Del. 2008) (opining that an act of juvenile delinquency is incompatible with the concept of an "infamous crime").

Snyder brought his claim in the Southern District under 42 U.S.C. § 1983, alleging that the State violated his federal constitutional and federal statutory rights. The only federal statutory claim he developed in his amended complaint was his allegation that the State violated his rights under the National Voter Registration Act (NVRA), which "prohibits the State from removing the name of any registrant from the official list of eligible voters except 'as provided by State law, by reason of criminal conviction or mental incapacity.'" Pl.'s Am. Compl. ¶ 14, at 5 (quoting 42 U.S.C. § 1973gg-6(a)(3)(B)). He argued that his removal was in violation of State law because the Infamous Crimes Clause allows removal from the list of registered voters only persons convicted of an infamous crime and he was not convicted of such a crime. Thus, his federal statutory claim under the NVRA is dependent upon a violation of state law – the NVRA, according to Snyder, transforms a violation of state law into a violation of federal law.

We are not concerned with the merits of Snyder's theory in this regard. But we are concerned that, despite the fact that Snyder apparently believes that his claim in large part depends on an alleged violation of state constitutional law, he filed his § 1983 claim in federal court. We note that state courts have concurrent jurisdiction with federal courts over § 1983 claims. Love v. Rehfus, 946 N.E.2d 1, 19 n.21 (Ind. 2011) (citing Haywood v. Drown, 556 U.S. __, 129 S. Ct. 2108, 2111 (2009); Martinez v. California, 444 U.S. 277, 283 n.7 (1980)). By filing his claim in federal court and asking in his "prayer for relief" that Judge Lawrence certify the question to this Court, Snyder has successfully circumvented the normal course of litigation in Indiana courts. The State joined Snyder's motion asking Judge Lawrence to certify this question. Thus, both parties wanted this Court to resolve at least a part of their dispute but apparently did not want to go through the "trouble" of developing the issues in lower state courts, preferring to litigate the matter in the first instance here.

Even if Snyder wanted to litigate his federal claims in federal court, which he is clearly entitled to do, we note that either he or the State could have asked Judge Lawrence to stay the federal case pending resolution of this complicated issue of state law in the state courts. See Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 500-01 (1941). Of course, this would have added to the time and monetary costs of litigation, but there undoubtedly are many litigants who would prefer to avoid such costs by filing essentially an original action in this Court. Such

litigants are precluded from doing so because our original jurisdiction is limited to petitions for writs of mandamus and writs of prohibition. Ind. Const. art. VII, § 4; App. R. 60.

These concerns are not merely academic. The posture of this case has rendered review of this important question of state constitutional law difficult. First, the issues were not fully developed. Second, the briefs were not very helpful in discussing the history and purpose of the Infamous Crimes Clause, which likely is due to the lack of a clearly refined issue. Third, there is no record. As a result, we are left with questions as to whether this case is justiciable in the first instance. There is nothing in the record to suggest that Snyder actually was prevented from voting by operation of the statute. It is clear that he did not attempt to re-register, and if this were the only impediment to his voting, our review might be precluded due to his failure to exhaust administrative remedies.

Although we have accepted and answered the certified question in this case, we have not done so without hesitation. While there are benefits to the certified question – namely, ensuring uniform interpretation and application of Indiana law – there are significant pitfalls. See generally Randall T. Shepard, Is Making State Constitutional Law Through Certified Questions a Good Idea or a Bad Idea?, 38 Val. U. L. Rev. 327, 336-51 (2004) (discussing the advantages and disadvantages of certified questions concerning state constitutional law). Future litigants should bear this in mind when deciding whether to proceed in state court or in federal court, and they should consider any procedural mechanisms that may be available for litigating a state constitutional law claim in state court while a federal claim is pending in federal court.

## Conclusion

We hold that the Indiana Constitution was not violated when, upon being convicted of Class A misdemeanor battery and sentenced to an executed term of incarceration, David Snyder was disenfranchised but only for the duration of his incarceration.

Shepard, C.J., and Dickson and David, JJ., concur.
Rucker, J., concurs in Parts I and II, and concurs in result in Part III.

30