In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1899

DAVID R. SNYDER,

*Plaintiff-Appellant*,

*v.*

J. BRADLEY KING, TRENT DECKARD,
LINDA SILCOTT, AND PAM BRUNETTE,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-01019 — **William T. Lawrence**, *Judge.*

ARGUED SEPTEMBER 30, 2013 — DECIDED MARCH 11, 2014

Before WOOD, *Chief Judge,* and BAUER and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* This case is about small town politics, a bare-knuckle brawl, and the right to vote. But the appeal before us is limited to drier subjects: sovereign immunity, and

the pleading requirements for a civil rights action against a municipality. The district judge dismissed the state-affiliated defendants on immunity grounds, and found that the plaintiff failed to state a claim against the county-affiliated defendants. He then went on to consider whether injunctive or declaratory relief might be available to the plaintiff, but that was unnecessary. His initial findings were correct, and they dispose of the case entirely. We affirm the dismissal.

## I. BACKGROUND

In 2003, David Snyder was elected to the Roseland Town Council, which serves a small incorporated community located at the north end of South Bend, Indiana, near the Indiana-Michigan line. It is fair to describe Snyder's tenure on the Roseland Town Council as controversial. *See, e.g.,* Welcome to Snyderville (Notre Dame Student Film Festival 2007), *available at* http://www.youtube.com/watch?v=Xzyny_bThHs (published Feb. 28, 2013). At a council meeting on January 11, 2007, Snyder was involved in a fistfight with fellow council member Ted Penn. He was arrested and charged with battery, as defined at Ind. Code § 35-42-2-1, and with felony intimidation, as defined at Ind. Code § 35-45-2-1(a)(2).

On July 31, 2008, a jury convicted Snyder of battery as a Class A misdemeanor, but acquitted him of the felony intimidation charge. The court handed down a one-year sentence, with six months suspended and six months to be executed on home detention. In February 2009, the court determined that Snyder had violated the terms of his probation and found that a period of incarceration was warranted.

Snyder served the remainder of his sentence at the St. Joseph County Jail. He was released in May 2009.

On March 4, 2009, while Snyder was still incarcerated, defendants Linda Silcott and Pam Brunette, then members of the St. Joseph County Voter Registration Board, sent him a letter announcing that his voter registration had been cancelled pursuant to Ind. Code § 3-7-46. Section 3-7-46-2 provides that "[a] person imprisoned following conviction of a crime is disfranchised during the person's imprisonment," and Section 3-7-46-1 directs that "a county voter registration office shall remove from the official list of registered voters the name of a voter who is disfranchised under this chapter due to a criminal conviction." Indiana law did (and does) permit Snyder to re-register to vote at any time following his release from jail, and Snyder knew he could exercise that right. *See* Ind. Code § 3-7-13-5. Nonetheless, Snyder refused to re-register. He went to the polls to vote in a special election in November 2009, and, to nobody's surprise, he was turned away.

This lawsuit followed. Invoking 42 U.S.C. § 1983 as the basis for his action, Snyder sued J. Bradley King and Trent Deckard ("State Defendants") in their official capacities as Co-Directors of the Indiana Election Division, and he sued Linda Silcott and Pam Brunette ("County Defendants") in their official capacities as members of the St. Joseph County Voter Registration Board. He alleged that his temporary disenfranchisement violated the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg; the Help America Vote Act of 2002, 42 U.S.C. § 15301; the Civil Rights Act of 1964, 42 U.S.C. § 1971; the First and Fourteenth Amendments to the United States Constitution; and Article 2, Section 8, of the Indiana

Constitution. Notably, he did not include any allegations that his injury was caused by a municipal-level custom or policy promulgated by the County Defendants.

At the request of the parties, the district court certified the Indiana constitutional question to the Indiana Supreme Court. Snyder's argument was that Article 2, Section 8, only authorizes the General Assembly to disenfranchise those convicted of "infamous crimes," and, since his was not an "infamous crime," he could not be stripped of his voting rights. The Indiana Supreme Court agreed that Snyder's disenfranchisement was not authorized under the particular provision at issue, but held that the Indiana Constitution separately authorized the assembly to temporarily disenfranchise *any* incarcerated convict: "the Indiana General Assembly has authority under its general police power to disenfranchise persons incarcerated upon conviction of a crime, so long as the disenfranchisement lasts only for the duration of incarceration." *Snyder v. King*, 958 N.E.2d 764, 785-86 (Ind. 2011).

After the Indiana Supreme Court issued its ruling, the parties cross-moved for summary judgment on the remaining claims in the district court. Before ruling on the motions, however, the district court, acting sua sponte, ordered the parties to file additional briefing addressing the continued justiciability of the controversy. The issues were fully briefed, and both parties took the position—albeit for different reasons—that the case was not moot and could continue. Regardless, the district court dismissed the case. *Snyder v. King*, No. 1:10–cv–01019, 2013 WL 1296791 (S.D. Ind. March 28, 2013).

As a threshold matter, the district court held that the State Defendants were not a proper party to the suit on sovereign immunity grounds. Neither party takes issue with that conclusion. Next, the district court held that the suit against the County Defendants also failed, because a county "cannot be held liable under Section 1983 for acts that it did under the command of state or federal law." *Id.* at *2 (quoting *Bethesda Lutheran Homes and Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998)). That rule is based on the statutory elements of a 42 U.S.C. § 1983 claim against a municipal entity, as discussed by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny.

Despite the *Monell* dismissal, the district court went on to separately consider Snyder's claim for injunctive and declaratory relief against the County Defendants. The district court found those claims insufficient to preserve a live controversy for two reasons. First, the specific language of the complaint sought an injunction "preventing" the defendants from removing Snyder from the voter rolls. Since Snyder had already been removed, the district court held that it had no power to redress his injury through the relief requested: "one cannot 'prevent' something that has already occurred." *Id*. at *3. Second, to the extent that Snyder's claim for injunctive relief might be construed more broadly as a demand for *reinstatement* to the voter rolls, the district court found that no controversy existed because Snyder was free to re-register at any time if he would simply choose to do so. *Id*. at *4.

On appeal, the parties continue to agree that the case is not moot, and jointly ask us to reverse the dismissal by the district court. Their reasons differ in some respects. Snyder believes

that a live controversy exists because nominal damages are available against the County Defendants and because his requests for declaratory and injunctive relief—namely, reinstatement to the voter rolls under his previous registration—are still pending. The defendants disagree as to the availability of money damages of any kind, but agree that Snyder may still seek equitable relief from the County Defendants.

We are not at all bound to find that a dispute is justiciable simply because both parties believe that it is, and this is an instance where we must exercise our prerogative to hold otherwise. Snyder has affirmatively waived any challenge to the dismissal of the State Defendants, and he has failed to state a *Monell* claim against the County Defendants. As a result, he simply has no lawsuit left; mootness is not the issue. Despite some confusion along the way, the district court reached the right result, and we affirm its dismissal of the case.

## II. ANALYSIS

The district court ultimately dismissed the case because it believed that the case was moot. But the district court arrived at the mootness question only after reaching several preliminary conclusions. First, the district court found that the State Defendants were not proper parties to the suit. Next, the district court threw out the claim against the County Defendants on *Monell* grounds, essentially finding that Snyder failed to state a claim. Finally, the district court found that the remaining claim for injunctive relief against the County Defendants was moot, and dismissed the case entirely.

We review each of the district court's conclusions *de novo*. *See, e.g., Lavalais v. Village of Melrose Park*, __ F.3d __, 2013 WL 5753781 at *2 (7th Cir. Oct. 24, 2013) ("We review *de novo* a Rule 12(b)(6) dismissal for failure to state a claim."); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 929 (7th Cir. 2008) (we review a grant or denial of sovereign immunity *de novo*); *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614 (7th Cir. 2003) (we review questions of justiciability *de novo*, looking beyond the pleadings if necessary). Our review shows that the district court's last step—the mootness analysis—was unnecessary. The lawsuit is properly dismissed on immunity and *Monell* grounds alone. We therefore affirm the dismissal of the case without reaching the mootness question.

## A. *The State Defendants*

We first review the dismissal of the State Defendants. The specific grounds for the district court's dismissal of the State Defendants are not discussed in its order, but it is clear that they were dismissed. Snyder knew dismissal was a possibility; the district court's order demanding additional briefing by the parties highlighted its concerns about the viability of the State Defendants as parties to this suit. But Snyder's briefing did not respond to those concerns at all, nor has Snyder attacked the district court's dismissal of the suit against the State Defendants on appeal. Accordingly, any argument on the subject is waived. *Luellen v. City of East Chicago*, 350 F.3d 604, 612 nn.4–5 (7th Cir. 2003) (arguments not raised on appeal are waived); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("We have long held that '[i]ssues that a claimant fails to raise before the district court are waived on appeal.'") (quoting *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 537 n.

4 (7th Cir. 1992)). Moreover, Snyder has affirmatively conceded that he cannot obtain any meaningful relief against the State Defendants. The district court's dismissal of the State Defendants must therefore be affirmed.

## B.  The County Defendants

The second question is whether Snyder can obtain any relief from the County Defendants. He believes that he can, both in terms of nominal damages for a proven constitutional violation and in terms of injunctive and declaratory relief. The defendants disagree as to nominal damages, but agree as to the availability of injunctive or declaratory relief. In fact, neither is available.

### 1.  Nominal Damages

Snyder first argues that his case is not moot because he may obtain nominal damages from the County Defendants in the event that a federal constitutional violation is shown. Snyder's argument is based on the general rule that a plaintiff who successfully proves a constitutional violation is entitled to at least a nominal award. *See, e.g., Calhoun v. DeTella*, 319 F.3d 936, 941–42 (7th Cir. 2003). But that argument misses the point. Under well-established precedent, a plaintiff cannot state a Section 1983 claim against a municipal entity, or against a municipal officer in his or her official capacity, unless certain requirements are met. If Snyder has not stated an actionable claim against the County Defendants, then he cannot possibly be entitled to *any* damages against the County Defendants, regardless of whether a successful plaintiff might be entitled to nominal damages in some other hypothetical context.

### a. *Snyder Has Not Stated a Section 1983 Claim.*

Snyder sued the County Defendants in their official capacities under 42 U.S.C. § 1983, which is essentially another way of suing the county-affiliated entity they represent. This means that Snyder can only proceed against the County Defendants to the extent that he would be able to proceed against the county—or, more specifically, against the St. Joseph County Voter Registration Board—itself. *Monell*, 436 U.S. at 690 n.55. Accordingly, we apply the rules governing municipal liability to determine whether Snyder has stated a claim against the County Defendants. In doing so, we note that a district court's sua sponte dismissal on *Monell* grounds, while unusual, is not legally impermissible so long as the district court gives the parties an opportunity to respond. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006). The district court did so in this case.

Section 1983 only permits an individual to sue a "person" who deprives that individual of his or her federally-guaranteed rights under color of state law. Local governing bodies—and the officers thereof, acting in their official capacities—do generally qualify as "persons" under the statute. *Monell*, 436 U.S. at 690–95 (establishing the foundational rule). But that is not true when a local governing body acts solely as an extension of the State, because State governments and State officials are *not* "persons" within the ambit of Section 1983. *See, e.g., Kaimowitz v. Bd. of Trs. of Univ. of Ill.*, 951 F.2d 765, 767 (7th Cir. 1991) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989)). As a result, whether or not a plaintiff has stated a Section 1983 claim against a municipal entity typically hinges on the extent to which that municipal entity was

independently responsible for the allegedly unconstitutional act.

In answering that question, courts have focused on whether "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Leahy v. Bd. of Trs.*, 912 F.2d 917, 922 (7th Cir. 1990) ("Proximate causation between the municipality's policy or custom and the plaintiff's injury must be present.") (quoting *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985)). To say that any such direct causal link exists when the only local government "policy" at issue is general compliance with the dictates of state law is a bridge too far; under those circumstances, the state law is the proximate cause of the plaintiff's injury. *See Surplus Store and Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 791-92 (7th Cir. 1991)); *Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (county cannot be liable for "merely implementing" a policy created at the state level); *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980) (municipal entity cannot be held liable for simply enforcing state law because the municipal policy in that instance "may more fairly be characterized as the effectuation of the policy of the State … embodied in that statute, for which the citizens of a particular county should not bear singular responsibility."). This is the rule to which the district court was referring when it invoked *Bethesda*: a county "cannot be held liable under Section 1983 for acts that it did under the command of state or federal law." 154 F.3d at 718.

The operative complaint in this case is devoid of any remotely specific allegation that a county-level policy or custom caused Snyder's harm. That alone is grounds for

dismissal. *See, e.g., Pam v. City of Michigan City*, No. 3:12-CV-265, 2012 WL 4060970 at *3 (N.D. Ind. Sept. 7, 2012) (collecting cases from district courts within our circuit). For one reason or another, both the parties and the court expanded their discussion to include matters outside of the pleadings, rather than grapple with the obvious defect in the complaint itself. But even when those outside matters are taken into account Snyder has failed to state an actionable claim.

Snyder argues that his injury was directly caused by the County Defendants because they made a "conscious policy choice [to remove him from the voter rolls] from among existing alternatives, a choice which violated the constitution." (Appellant's Br. at 18.) There are three basic steps to his argument. First, Snyder claims that the Indiana Code defines the word "crime," as used in Section 3-7-46-2 and elsewhere, in such a way that it is ambiguous, meaning either "felony," "misdemeanor," or both. Second, Snyder argues that the County Defendants, in removing him from the voter rolls, *themselves* resolved the "crime" ambiguity in the voter-disenfranchisement provisions in question to include both felonies and misdemeanors. Third, Snyder argues that, in doing so, the board took an action that was merely "authorized," not "compelled," by state law, and that this case therefore falls outside the scope of *Bethesda* and related authorities. Putting it all together, Snyder sees an independent policy decision by the County Defendants to remove him from the voter rolls, one made possible—but not dictated—by statute.

If each step of Snyder's argument was correct, it would indeed lead to the conclusion he desires. *See, e.g., Vives v. City*

*of New York*, 524 F.3d 346, 351 (2d Cir. 2008) (collecting authorities which, to varying degrees, found "that a municipality engages in policy making when it determines to enforce a state law that authorizes it to perform certain actions but does not mandate that it do so."); *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005). The problem is that none of them are correct.

The first step in Snyder's argument is his assertion that the use of the word "crime" in the statute is ambiguous, because the word "crime" in the Indiana Code can refer to a felony, a misdemeanor, or both. Snyder is mostly right about the meaning of the word. For our purposes, "'crime' means a felony *or* a misdemeanor." Ind. Code § 35-31.5-2-75(a) (emphasis added).[1] But nothing about that makes the relevant code provision ambiguous. Replacing the phrase "a crime" with the phrase "a felony or a misdemeanor" in the text illustrates our point. Section 3-7-46-2 would read, "[a] person imprisoned following conviction of [a felony or a misdemeanor] is disfranchised during the person's imprisonment." No rule of usage in the English language supports construing that sentence to create a "reader's choice" scenario, in which local boards choose which crimes it covers and which it does not. That sentence means that a person convicted of *either* a felony or a misdemeanor is temporarily

---

[1] This is consistent with what any layperson would understand the word "crime" to mean. There are few words in the legal lexicon with a more widely understood plain meaning than "crime," defined generally as "[a]n act that the law makes punishable; the breach of a legal duty treated as the subject-matter of a criminal proceeding." *Black's Law Dictionary* (9th ed. 2009).

disenfranchised. There is no ambiguity to the statute, and that alone invalidates Snyder's argument. Contrary to his assertions, the statutory directive does not leave the reader with any room to choose how broadly to define the word "crime."

The second step in Snyder's argument is his assertion that the County Defendants themselves decided to broadly interpret the word "crime" in the statute. That assertion is independently faulty. Even if there was room to interpret the statute—and there is not—the County Defendants would never be the ones doing the interpretation. The mechanism by which disenfranchisement of incarcerated persons occurs is laid out in the code. Under the scheme, on a quarterly basis, a county sheriff must provide the county voter registration board with a list of every individual who "(1) is a resident of Indiana; (2) has been convicted of a crime; and (3) has been placed in a county correctional facility during the previous quarter." Ind. Code § 3-7-46-6. When the county voter registration board receives such notice, it "*shall* … remove the name of the person from the voter registration records[.]" Ind. Code § 3-7-46-7.5 (emphasis added). In other words, there is no opportunity for the County Defendants—as members of the voter registration board—to decide what constitutes "a crime" under Section 3-7-46-2. The county sheriff, if anyone, decides who qualifies for the disenfranchisement list; all the voter registration board does is delete the names the sheriff provides. The role of the local voter registration boards is therefore purely reactionary.

It is easy to see, given the flaws in the first two steps in Snyder's argument, why the third step and his conclusion are also wide of the mark. Snyder hopes to paint this case as one

in which the County Defendants made an independent choice from among various alternatives authorized by state law, but that characterization is based on an inaccurate understanding of the Indiana system. The statute in question does not merely authorize removal from the voter rolls for incarcerated convicts. The statutory language is compulsory.[2] And to the extent that any discretion *is* permitted, it is exercised by actors other than the County Defendants. Snyder knows that; the "Factual Allegations" section of his own Amended Complaint places interpretive responsibility squarely on the shoulders of State-level actors, and not on the County Defendants.

For all of these reasons, this situation does not support a finding of *Monell* liability. When state law unequivocally instructs a municipal entity to produce binary outcome X if condition Y occurs, we cannot say that the municipal entity's "decision" to follow that directive involves the exercise of any meaningful independent discretion, let alone final policy-making authority.[3] It is the statutory directive, not the follow-

---

[2] In addition to the provisions concerning how removal is carried out, see the general directive at Ind. Code § 3-7-46-1: "a county voter registration office *shall* remove from the official list of registered voters the name of a voter who is disfranchised … due to a criminal conviction."(emphasis added).

[3] We say that the code sections instruct county registration boards to produce a certain "binary outcome" under the circumstances prescribed because a person either is, or is not, removed from the voter rolls. There is no in-between, and there are no constitutionally or statutorily meaningful variables that govern the manner in which the act of removal from the voter rolls is accomplished. We highlight this reality to distinguish the instant

(continued...)

through, which causes the harm of which the plaintiff complains.

Finally, we note that it makes no difference that the County Defendants exercise broad independent discretion with respect to *other* matters of election law and procedure; the question is whether the plaintiff has identified the decisionmaker "responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986). The subject matter in question is the removal of incarcerated convicts from the voter rolls, and the only "policy" the County Defendants established with respect to that issue was to follow the mandatory mechanism laid out by statute. Whether one views their role as merely implementing the statutory directive, or as carrying out the removal of those identified as statutorily appropriate by the local sheriff, the

---

[3] (...continued)

case from those in which state law instructs a municipal official to take a certain action, but leaves room for abundant discretion in determining the manner in which such an action should be carried out. For example, in *Mercado v. Dart*, 604 F.3d 360, 365 (7th Cir. 2010), we explained that even if the Illinois code provision authorizing county sheriffs to perform a strip search of all inmates entering a county jail is read to make a strip search mandatory, it still leaves room for the sheriffs to set local policy with respect to the level of intrusiveness involved and the manner in which the search is conducted. *Id*. 365. A given sheriff's independent decisions, with respect to those secondary questions, could easily be the difference between an unconstitutionally intrusive search and one which was not. *Id*. But the instant case is clearly different. The alleged constitutional violation *is* the removal from voter rolls—the very thing mandated by statute—and there is no more to it than that. It is not as if removal by white-out might be constitutionally suspect, while removal by delete key clearly is not.

local voter registration boards simply do not make an independent policy judgment. "The mere authority to implement pre-existing rules is not the authority to set policy," *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004), and neither is it enough to sustain a suit under Section 1983.

   b.   *Nominal Damages Are Not Available.*

The next question is whether Snyder may still obtain nominal damages from the County Defendants despite the fact that he has not stated a claim against them under Section 1983. It is clear that he cannot. No plaintiff can recover *any* kind of damages against a defendant without first obtaining a judgment against that defendant, and a prerequisite to a judgment is a lawsuit. Snyder does not have a lawsuit against the County Defendants, because he failed to state a claim.

   2.   *Injunctive and Declaratory Relief*

Both the parties and the district court spoke about the possibility of injunctive and declaratory relief against the County Defendants as though it were an issue totally distinct from whether Snyder adequately stated a *Monell* claim against those defendants. That was incorrect. The Supreme Court has squarely held that *Monell*'s "policy or custom" requirement applies in Section 1983 cases irrespective of whether the relief sought is monetary or prospective. *Los Angeles Cnty., Cal. v. Humphries*, 131 S. Ct. 447, 453–54 (2010). Snyder cannot obtain injunctive or declaratory relief against the County Defendants for the same reason he cannot obtain nominal damages: he has not adequately pleaded a suit against them. It is therefore unnecessary to consider whether any claim for injunctive relief is moot.

### III. CONCLUSION

We acknowledge that the right to vote is fundamental, and we do not take any case alleging its infringement lightly. But it is incumbent on a litigant to identify a proper defendant for his suit and to properly plead an action against that defendant. Snyder has not done so. Because Snyder has waived any challenge to the dismissal of the State Defendants, and because he has failed to state a claim against the County defendants, we AFFIRM the district court's dismissal of his suit.

WOOD, *Chief Judge*, concurring in the judgment. I agree with my colleagues that David Snyder's suit against the Co-Directors of the Indiana Election Division (the State Defendants) and the named members of the St. Joseph County Voter Registration Board (the County) must be rejected as a matter of law. My path to that conclusion is, however, somewhat different from theirs. I agree with them that Snyder's suit against the State Defendants was properly dismissed on sovereign immunity grounds. Indeed, as they point out, *ante* at 5, that conclusion appears to be unchallenged on appeal. With respect to the County (and the named defendants in their official capacity, which amounts to the same thing), I would stop with the majority's observation at the bottom of page 10 that "[t]he operative complaint in this case is devoid of any remotely specific allegation that a county-wide policy or custom caused Snyder's harm." In other words, the reason Snyder fails is not because a claim was impossible under the state and county laws governing voter registration; it is because Snyder failed to plead the correct causes of action.

*Monell v. Dep't of Soc. Servs.* held that municipalities and counties qualify as "persons" for liability under 42 U.S.C. § 1983, 436 U.S. 658, 663 (1978); states do not, according to *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64 (1989). Entities do not lose their status as "persons" because of rulings on the merits. It is thus important to recognize, as I believe the majority does, *ante* at 5, that even though a county "cannot be held liable under section 1983 for acts that it did under the command of state or federal law," *Bethesda Lutheran Homes and Servs., Inc. v. Leean,* 154 F.3d 716, 718 (7th Cir. 1998), that is not because the county somehow loses its status as a "per-

son" in such a situation. It is because there is no county policy that is driving the county to act in a certain way. The latter is a point on the merits, not a point about which kinds of entities fall within the scope of the statute.

Having recognized that the County is subject to suit under § 1983, the majority turns to the details of Snyder's complaint. It rejects the idea that Snyder could have been complaining about the way in which county officials were implementing Indiana's statutory scheme for temporary disenfranchisement of convicted criminals. But as I read his complaint, that is exactly what he is doing: he believes that state law leaves enough discretion with the local authorities to permit a valid claim against the County under *Monell*. Snyder argues that state law merely gives county officials the *authority* to cancel the voter registration of someone in his position (a convicted misdemeanant), and that it does not *compel* them to take this step. All that Ind. Code 3-7-46-1 says is that counties must remove voters who are disenfranchised because of a "criminal conviction." The statute does not constrain them further, and so, Snyder argues, a county could decide that a threshold of seriousness must be passed before something as drastic as the loss of the right to vote takes place. The usual such threshold would be the line between misdemeanors and felonies. See Compl. ¶¶ 9, 10, for places in which Snyder explains that this is where he finds the County's discretion. Paragraph 10, in fact, alleges that the State Defendants "advised" all county officials that all criminals—felons and misdemeanants alike—should be disenfranchised, not that they ordered this result.

Essentially, Snyder is making a legal point about the Indiana statute. Our review of the law is *de novo*, and it lies comfortably within the authority of the district court to dismiss a complaint for failure to state a claim upon which relief can be granted. With the contribution of the Supreme Court of Indiana in this very case, *Snyder v. King*, 958 N.E.2d 764 (Ind. 2011), they conclude that the governing Indiana statutes operate to require the temporary disenfranchisement of any person incarcerated after any criminal conviction. Under that understanding of Indiana law, Snyder's complaint was properly dismissed under Federal Rule of Civil Procedure 12(b)(6). It was not moot, however. I believe that my colleagues also find no mootness, since they conclude at the end that Snyder "has failed to state a claim against the County defendants," *ante* at 17. (If it were moot, then the dismissal would have to be under Rule 12(b)(1), for lack of subject-matter jurisdiction.)

I am not thoroughly convinced that Indiana law restricts the County so strictly that there is no room left for a genuine county-level policy in this area that can be evaluated under *Monell*. Nor is it crystal-clear to me that any attempt to replead this case would be doomed. But the district court has substantial discretion on the latter point, and Snyder's complaint does not do a good job of explaining exactly what discretion he thinks the County retains. For these reasons, I concur in the judgment.